871 P.2d 237

**STATE of Arizona, Appellee,**

v.

**David Martinez RAMIREZ, Appellant.**

**No. CR–90–0359–AP.**

Supreme Court of Arizona,
En Banc.

March 24, 1994.

4. Findings of Fact, Conclusions of Law and Recommendation of Hearing Committee, p. 3.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Daniel J. Kiley, John Pressley Todd, Asst. Atty. Gen., Phoenix, for State.

Neal W. Bassett, Phoenix, for Defendant/Appellant.

## OPINION

CORCORAN, Justice.

David Martinez Ramirez (defendant) was convicted of two counts of premeditated first-degree murder and sentenced to death on both counts. This automatic appeal followed. *See* A.R.S. § 13–4031; rules 26.15, 31.2(b), and 31.15(a)(3), Arizona Rules of Criminal Procedure. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. §§ 13–4031 to –4033, and we affirm defendant's convictions and sentences.

## ISSUES PRESENTED

The following issues are presented on appeal: [1]

1. Does Arizona's death penalty appeal process violate the equal protection guarantees of the United States and Arizona Constitutions?

---

1. Defendant also argued on appeal that the prosecutor improperly elicited testimony from a criminalist that she had preserved items of evidence for defense testing. At oral argument, defendant withdrew this argument from consideration.

2. Did the trial court err in admitting defendant's statements under "the public safety exception" to *Miranda*?

3. Did the prosecutor improperly comment on defendant's post-arrest silence in his closing argument?

4. Did the trial court err when, in response to a question that the jurors had while deliberating, it instructed the jurors to rely on the instructions previously given?

5. Is A.R.S. § 13–703(C) unconstitutional because it permits a trial court to withhold sentencing information under certain circumstances?

6. Did the trial court err in finding that the murders were committed in an especially heinous, cruel or depraved manner?

7. Does the absence of DNA testing entitle defendant to mitigation of punishment?

## FACTS AND PROCEDURAL HISTORY

Defendant, an acquaintance of Mrs. G and her 15–year–old daughter, visited Mrs. G and her daughter at their West Phoenix apartment on the evening of May 24, 1989. The following morning, at about 2:30 a.m., a resident of the apartment complex observed defendant talking with Mrs. G outside Mrs. G's apartment. Defendant was wearing a white shirt and dark pants. Defendant and Mrs. G were still talking when the resident went back inside her apartment at about 3:30 a.m.

Priscilla Arce, her sister Kathy, and Kathy's boyfriend, Larry Bernabe, lived in the apartment directly above Mrs. G's. At about 5:00 a.m., they were awakened by banging, screaming, and running noises coming from the apartment below. Bernabe and Kathy went down to Mrs. G's apartment to investigate. When Bernabe knocked on the front door, the noises immediately stopped, but no one answered. Bernabe decided to phone the police. Not having a phone in their apartment, he went to a neighbor's apartment to use their phone; there was no response to his knocks. Uncertain of what to do next, Bernabe and Kathy went back upstairs to their apartment and listened for any additional activity or noises.

About 5 minutes later, Bernabe heard a bang against the wall and one last loud female scream. Priscilla also heard a female scream "no, or help me, or something like that" and then one last "ugly scream." Bernabe ran back down to Mrs. G's apartment and tried to kick down the door. He called out to Mrs. G and her daughter, but there was no response. He then ran to a window at the back of the apartment and looked into the daughter's bedroom. He noticed that a lamp was on the floor and observed a shadow moving in the hallway near the bathroom. After briefly looking in Mrs. G's bedroom window, Bernabe proceeded to the public phones located near the apartment and dialed 911.

The police arrived 2–3 minutes later at about 5:36 a.m. Bernabe and Kathy directed them to Mrs. G's apartment. Sgt. Stahl and Lt. Richards immediately proceeded to the front door where they knocked and announced their presence. When no one responded, Lt. Richards went to the back of the apartment where he was joined by Officer Sapon. Meanwhile, at the front of the apartment, Sgt. Stahl was joined by Sgt. Howk. The police officers remained in contact with each other through the use of portable radios.

Lt. Richards and Officer Sapon looked in the daughter's bedroom window. Lt. Richards noticed blood on the window frame and latch. The officers then observed defendant entering the bedroom. Officer Sapon announced the police officers' presence and yelled at defendant to go to the front door. Defendant "grunted" and left the bedroom. Officer Sapon then broadcast over the police radio that he observed a subject wearing "a red shirt and suspenders." Lt. Richards further described the suspect as "Hispanic, wearing suspenders."

A minute or two later, Lt. Richards and Officer Sapon heard the sound of window blinds rustling in Mrs. G's bedroom. Lt. Richards investigated the noise while Officer Sapon remained at the daughter's bedroom window. While Lt. Richards was away, defendant returned to the daughter's bedroom. Officer Sapon once again told defendant to go the front door and unlock it.

Officer Hartson, who had arrived on the scene, obtained a passkey to the apartment from the manager of the apartment complex. He delivered the key to Sgts. Stahl and Howk, who were still at the front door. Before using the key, the police once again knocked on the door, announced their presence, and told defendant to open the door. When no one responded, Sgt. Stahl unlocked the door and he and Sgt. Howk entered the apartment.

The first thing they observed was a bloody knife blade without a handle lying in front of the door. As they approached the living room, they saw Mrs. G's clothed body lying on the floor. The officers drew their weapons and proceeded to the living room. As they walked toward Mrs. G's body, defendant approached them from the hallway. They yelled at defendant to put his hands on the back of his head; he responded by raising his hands in the air. Defendant was not wearing a shirt and "had blood all over his body, front to back." The only injuries defendant had sustained, however, were cuts on the inside of his fingers on both hands. Sgts. Stahl and Howk delivered defendant to Officer Hartson at the front door.

When informed that a male subject had been detained, Lt. Richards asked whether they had detained the "guy with the suspenders." When he was told no, Lt. Richards responded, "[t]here is a guy in that apartment with suspenders, you need to find him."

In the meantime, Officer Hartson placed defendant in an arm bar and made him kneel on the grass a few feet from the front door. Sgt. Howk stepped out of the doorway and asked Officer Hartson who else was in the apartment. Without informing defendant of his *Miranda* rights, Officer Hartson turned to defendant and asked him 3 questions. He first asked defendant what was going on. Defendant responded, "[w]e had a big fight." Officer Hartson then asked who else was inside. Defendant replied, "[m]y girl friend and her daughter." Last, Officer Hartson asked defendant if anybody else was hurt, to which defendant responded, "[y]eah, they're hurt pretty bad. We're all hurt pretty bad." Officer Hartson immediately relayed this information to Sgt. Howk.

Sgts. Stahl and Howk reentered the apartment and conducted a protective sweep. Sgt. Stahl testified that they "were looking possibly for the guy with the red shirt." No such suspect was found. However, upon entering the daughter's bedroom, they found the daughter's naked body lying face down on a blanket.

While Sgts. Stahl and Howk were still in the apartment, Officer Hartson escorted defendant to the patrol car. Defendant volunteered the following statement: "You can ask anyone, me and my girlfriend are very close, we're going to get married." Officer Hartson observed that defendant appeared to be under the influence of drugs or alcohol.

Investigator Fuqua, who was in charge of the investigation, supervised a detailed examination of the apartment. At trial, he described the murder scene. In the foyer area, blood was smeared on the walls on both sides of the entryway and on the front door. Just inside the door lay a bloody knife blade. The floor near the baseboard was stained with blood that appeared to be from the hair from someone's head.

Mrs. G's body lay face up on the living room floor near a love seat. Investigator Fuqua observed that she had suffered numerous stab wounds. On Mrs. G's left leg, beneath her knee, were droplets of blood, which appeared to have fallen straight down from their origin at a 90° angle. A cake knife, bent at a 45° angle, lay near her right arm, and a portion of its handle was in her hair. Also in her hair was a handle from another knife that matched the knife blade found near the front door.

The couch in the living room was stained with blood and pulled away from the wall. A blood spatter on the wall indicated that someone had been behind the couch. A pillow on the floor was also stained with blood, and blood was spattered on the wall near the television. A pair of blood-stained suspenders lay on a chair.

The bathroom had blood on the floor, door, walls, sink and bathtub. Water was running in the bathtub, diluting the blood in it. On the toilet seat, on top of a garment, lay a pair of scissors. The scissors were saturated with

blood and had hair sticking to them. A portion of one of the shears was broken off.

The kitchen area was also covered with blood—on the floor, wall, sink, stove, and cabinets. Several drawers were pulled open, and at least two of them had blood droplets inside. A man's white shirt, stained with blood, lay on an ironing board in the dining area. In the hallway outside the kitchen lay a blood-soaked box cutter knife.

The daughter's bedroom was "in a state of considerable disarray." The daughter's blood-covered naked body was lying face down on the floor on a blanket. The dresser was pulled out about 3 feet from the wall, and the stereo speakers that had been on the dresser were knocked over on the floor and stained with blood. In the corner of the room lay a bloody towel that contained hair consistent with that of the daughter. Blood was on the floor, door, walls, dresser, the window, and the window's lock mechanism.

Except for a long streak of blood running down the wall to the right of the window, Mrs. G's room showed no signs of disturbance. Outside the front door of the apartment, the police found a three-finger blood smear on an exterior wall.

Mrs. G's autopsy revealed that she had been stabbed 18 times in the neck. One of these wounds penetrated her jugular vein and was potentially fatal. The wounds in Mrs. G's neck were approximately an inch deep and the shapes of the wounds were consistent with the scissors the police found in the bathroom. Mrs. G was also stabbed in the back and in her knee. The wound to the back also proved to be potentially fatal. In addition to the wounds to her neck, back and knee, Mrs. G sustained defensive wounds on both of her forearms and on her left hand. She also suffered bruising and hemorrhaging around her eyes consistent with a blunt force injury. The medical examiner testified that, despite the fatal wounds inflicted on her body, Mrs. G would have been able to "move about" for a brief period of time.

The daughter's autopsy revealed that she had been stabbed 15 times in the neck. She also sustained bruises and abrasions to her face. The medical examiner testified that although the stab wounds caused her death, her death was not immediate.

The police obtained vaginal swabs from the daughter that tested positive for semen. Criminalist Inta Meya testified that, based on the tests she conducted, she was unable to exclude defendant as a possible semen donor.

Although defendant did not testify at trial, his defense was, in essence, that no direct evidence linked him to the crime—i.e., no fingerprints were found on the murder weapons—and that his mere presence was insufficient to sustain a murder conviction. The defense further maintained that another person had entered the apartment while defendant, Mrs. G, and the daughter were asleep, and that person committed the murders. The jury unanimously found defendant guilty of 2 counts of premeditated first-degree murder.

Before the sentencing hearing, defendant was given a psychological examination, during which he claimed that he had had 10 beers and 2 mixed drinks on the night of the murders, and that he had injected cocaine 6 times that evening. Defendant, who was 32 years old at the time of the murders, also admitted during the psychological examination that he had sex with the 15-year-old daughter on the night of the murders and that he had sex with her on 4 previous occasions.

Before imposing sentence, the trial court gave defendant an opportunity to speak on his own behalf, but he chose not to address the court. The trial court sentenced him to death on both counts. In its special verdict, the court found 3 aggravating circumstances under A.R.S. § 13–703(F): (1) that defendant had 2 prior violent felony convictions, (2) that defendant committed the murders in an especially cruel, heinous, or depraved manner, and (3) that defendant committed a multiple homicide during the commission of the crime. The court considered this last aggravating circumstance, which is defined by § 13–703(F)(8), to support the death sentence on either Count I or Count II.

In mitigation, the court found that defendant was impaired under § 13–703(G)(1). The court also found 7 non-statutory mitigat-

ing circumstances: (1) his unstable family background, (2) his poor educational experience, (3) that he was the victim of sexual abuse when he was young, (4) his gang affiliation, (5) his chronic substance abuse, (6) his psychological history, and (7) his love of family. The court determined that none of the mitigating circumstances, taken individually or collectively, warranted leniency.

## DISCUSSION

### I. *Constitutionality of A.R.S. § 13-4031*

■ Defendant argues that A.R.S. § 13-4031 violates the equal protection guarantees of the United States and Arizona Constitutions. Section 13-4031 provides:

> The state, or any party to a prosecution by indictment, information or complaint, may appeal as prescribed by law and in the manner provided by the rules of criminal procedure, *except criminal actions involving crimes for which a sentence of death has actually been imposed may only be appealed to the supreme court.*

(Emphasis added.) Defendant asserts that § 13-4031 is unconstitutional because it limits capital defendants to one appeal: a mandatory direct appeal to the supreme court,[2] whereas non-capital defendants have two possibilities for appeal: direct appeal to the court of appeals[3] and discretionary review by the supreme court.[4] Defendant argues that this statute violates the Equal Protection Clause of the United States Constitution because it has no rational basis. He further argues that § 13-4031 violates the Equal Protection Clause of the Arizona Constitution, art. 2, § 13, because it abridges his fundamental right to an appeal as guaranteed by art. 2, § 24, without promoting a compelling state interest. Defendant's arguments are without merit. Section 13-4031 is constitutional under both the United States and the Arizona Constitutions.

The United States Supreme Court found Florida's capital sentencing statute constitu-

tional in *Proffitt v. Florida*, 428 U.S. 242, 259-60, 96 S.Ct. 2960, 2970, 49 L.Ed.2d 913 (1976). Florida's capital sentencing procedures provide for automatic review of capital cases by the state supreme court in a manner similar to Arizona's. *Proffitt*, 428 U.S. at 250-51, 96 S.Ct. at 2966. The Court determined that Florida's automatic review procedure promoted consistency in death sentencing. *Proffitt*, 428 U.S. at 258-59, 96 S.Ct. at 2969. Thus, § 13-4031 has a rational basis and does not violate the United States Constitution.

■ Nor does § 13-4031 violate defendant's right to equal protection as guaranteed by art. 2, § 13 of the Arizona Constitution. This court has held that the constitutional right to appeal is subject to reasonable statutory regulations, and is infringed only when such conditions amount to a denial of justice. *Hancock v. State*, 31 Ariz. 389, 392, 254 P. 225, 226 (1927) (citations omitted). And, although strict scrutiny applies when a statute affects the right to bring an appeal, the rational basis test applies to those portions of a statute that do not affect the fundamental right to appeal but merely regulate it. *See Kenyon v. Hammer*, 142 Ariz. 69, 83, 688 P.2d 961, 975 (1984), distinguishing *Eastin v. Broomfield*, 116 Ariz. 576, 570 P.2d 744 (1977). Thus, because § 13-4031 is regulatory in nature—providing for direct appeal to the state's highest tribunal in capital cases—the rational basis test applies. *See Kenyon*, 142 Ariz. at 83, 688 P.2d at 975. And, as noted by the United States Supreme Court, there is a rational basis for requiring automatic review by a state's supreme court: such a review promotes consistency in death sentencing. *See Proffitt*, 428 U.S. at 258, 96 S.Ct. at 2969. Thus, we find that § 13-4031 does not violate art. 2, § 13 of the Arizona Constitution.

### II. *Trial Issues*

#### A. *Improper Miranda Questioning*

On the morning of the murders, defendant made certain statements in response to 3

---

**2.** A.R.S. § 12-120.21(A)(1); *see also State v. Brewer*, 170 Ariz. 486, 492, 826 P.2d 783, 789 (1992).

**3.** A.R.S. § 12-120.21(A)(1); rule 31.2(a), Arizona Rules of Criminal Procedure.

**4.** A.R.S. § 12-120.24; rule 31.19, Arizona Rules of Criminal Procedure.

questions asked by Officer Hartson. Before trial, defendant moved to suppress the statements. The trial judge denied the motion and ruled that the statements were admissible because:

> [T]hose statements were voluntary, ... they were not obtained in violation of the defendant's Fifth and Sixth Amendment rights, and ... they were obtained pursuant to public safety concerns of the officers at the time, also concern for the opportunity to rescue anybody that might still be in that apartment, and to protect themselves.

Defendant argues that the trial judge erred because the public safety exception does not apply, and his responses were obtained in violation of his *Miranda* rights.

"*Miranda* requires the police to give certain warnings to a person in custody before interrogating him." *United States v. Brady*, 819 F.2d 884, 887 (9th Cir.1987), citing *Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612–13, 16 L.Ed.2d 694 (1966). "A person is in custody if he is under arrest, or if his freedom of movement is restrained to a degree associated with formal arrest." *Brady*, 819 F.2d at 887, citing *New York v. Quarles*, 467 U.S. 649, 655, 104 S.Ct. 2626, 2631, 81 L.Ed.2d 550 (1984).

Defendant clearly was in custody when Officer Hartson questioned him. After he was removed from the murder scene, Officer Hartson placed defendant in an arm bar and made him kneel on the ground. In fact, Officer Hartson later testified that defendant was not free to leave at the time of the questioning. Thus, because defendant was in custody when Officer Hartson questioned him, *Miranda* warnings normally would have been required before the statements could be admitted at trial.

Exceptions to this general rule exist, however. The Supreme Court has stated that "[t]he prophylactic *Miranda* warnings ... are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination is protected.'" *Quarles*, 467 U.S. at 654, 104 S.Ct. at 2630, quoting *Michigan v. Tucker*, 417 U.S. 433, 444, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182 (1974). In *Quarles*, the Court recognized a public safety exception to the *Miranda* requirement, holding that *Miranda* need not "be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety." 467 U.S. at 656, 104 S.Ct. at 2632. The Court distinguished between "questions necessary to secure [the police's] own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." 467 U.S. at 659, 104 S.Ct. at 2633. The Court concluded that voluntary responses to the first type of questions could be admitted, despite the lack of *Miranda* warnings. *See Quarles*, 467 U.S. at 657–60, 104 S.Ct. at 2632–33.

■ Defendant does not argue that his statements were involuntary; instead, he argues that the public safety exception does not apply because the questions asked were investigatory in nature and thus went beyond the scope of the public safety exception recognized by the Court in *Quarles*. We disagree.

At the time that Officer Hartson questioned defendant, the police were operating under a great deal of uncertainty in a very dangerous situation. The police had been denied access to the apartment; yet, they knew that someone was in the apartment, wearing what they thought was a red shirt and suspenders. When they finally gained access to the apartment, the police were greeted with a blood-splattered room, a bloody knife blade lying on the floor, and the body of Mrs. G lying on the living room floor. As the officers surveyed the carnage, the bloodstained, shirtless defendant approached them from the hallway. While one of the officers took defendant into custody, another notified the officers stationed at the back of the apartment that they had detained a male subject. After being told that the subject was not wearing suspenders, one of the officers responded: "[t]here is a guy in that apartment with suspenders, you need to find him." It was in response to this situation that Officer Hartson, without first informing defendant of his *Miranda* rights, asked defendant the following three questions:

Q. What is going on?

A. We had a big fight.

Q. Who else was inside?

A. My girlfriend and her daughter.

Q. Is anybody else hurt?

A. Yeah, they're hurt pretty bad. We're all hurt pretty bad.

Only after receiving this information did Sgts. Howk and Stahl proceed further into the apartment.

Defendant basically argues that because Officer Hartson did not specifically limit his question to asking "who else is in the apartment," the public safety exception does not apply. We disagree.

The facts of this case are somewhat analogous to the facts in *United States v. Brady*, 819 F.2d 884 (9th Cir.1987). In *Brady*, police officers stopped a car that they believed contained a woman who had been abducted. After they stopped the car, the woman passenger ran toward the officers. The officers then drew their guns on the driver and ordered.him out of the car. Although a frisk of the defendant did not turn up any weapons, the officers still feared that a weapon might be within defendant's reach. It was getting dark and the officers faced a growing crowd in a rough neighborhood. To control what they perceived to be a dangerous situation, one of the officers asked defendant a number of questions without first giving him *Miranda* warnings. In fact, in *Brady*, the officer tried to obtain the suspect's consent to search the trunk of his car, and after his request was denied, the officer still proceeded to ask about the gun.

The question that the court in *Brady* considered in determining whether the public safety exception applied was "whether there was an *objectively* reasonable need to protect the police or the public from any immediate danger." *Brady*, 819 F.2d at 888 n. 3, quoting *Quarles*, 467 U.S. at 659 n. 8, 104 S.Ct. at 2633 n. 8. Thus, the court focused on the *nature* and *context* of the questions, and concluded that the questions were motivated by public safety concerns and were not designed to obtain evidence of a crime. *Brady*, 819 F.2d at 888. Accordingly, the court concluded that defendant's voluntary statements were admissible under the public safety ex-

ception, despite the absence of *Miranda* warnings.

The police officers in this case, as in *Brady*, faced a great deal of uncertainty. They did not know what had occurred in the apartment, how many people were involved, or whether anyone other than the person lying in the front room needed assistance. Moreover, the officers reasonably believed that someone who was wearing a red shirt and suspenders and who did not appear to be physically injured was in the apartment.

Officer Hartson's questions were directed at discovering what the police officers would encounter when they entered the apartment—i.e., they were geared toward eliciting information that the police needed to protect themselves and anyone else in the apartment. Merely because Officer Hartson asked more than one question to get this information does not change the nature of his inquiry from one motivated by a need to protect the safety of his fellow officers or members of the public to one designed to obtain evidence of a crime. Accordingly, we find that defendant's statements were made in response to questions that were necessary to secure the safety of both the police and the public, and thus the statements were admissible under the public safety exception to the *Miranda* requirements.

## B. *Prosecutor's Comments During Closing Argument*

The prosecutor stated in his closing argument:

Officer Hartson asks three really quick questions. What happened. We had a big fight. Well, who's in there. My girlfriend and her daughter. Are they okay. They're hurt pretty bad. We're all hurt pretty bad. Defense attorney asks Sergeant Hartson, what does the Defendant say. Well, I think it was, I didn't kill them.

Now, this is the same person who tells Officer Hartson that's my girlfriend and her daughter inside. That's the same person who said, we're supposed to be married. Where is the screaming by the Defendant, my girlfriend is hurt. What would you do if you were in this position

inside this apartment, much like the Defendant, four walls, a floor and a roof. Would you be screaming your head off for a neighbor, for help. Or would you be using—see that little thing up there to the top of Exhibit 2, that's the phone. The phone that was in the cradle, the phone with the blood droplets on it. The phone that was functional, the phone that worked. 911. Real fast. Three punches.

Defendant characterizes the prosecutor's statements as "comments about [defendant's] failure to proclaim his innocence at the time of his arrest." And, citing *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), defendant claims fundamental error on grounds that the prosecutor improperly commented on defendant's post-arrest silence. We disagree both with defendant's characterization of these statements and with his claim of error.

 We agree with defendant that a prosecutor may not comment on a defendant's post-arrest, post-*Miranda* warnings silence as evidence of guilt. *State v. Mauro,* 159 Ariz. 186, 197, 766 P.2d 59, 70 (1988), citing *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). As the United States Supreme Court has repeatedly stated, "*Doyle* rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.' " *Wainwright v. Greenfield,* 474 U.S. 284, 291, 106 S.Ct. 634, 638, 88 L.Ed.2d 623 (1986), quoting *South Dakota v. Neville,* 459 U.S. 553, 565, 103 S.Ct. 916, 923, 74 L.Ed.2d 748 (1983). A prosecutor may, however, comment on a defendant's pre-*Miranda* warnings silence, either before or after arrest, because no governmental action induced petitioner to remain silent, and thus, the fundamental unfairness present in *Doyle* is not present. *Greenfield,* 474 U.S. at 291 n. 6, 106 S.Ct. at 638 n. 6 (citations omitted). And, of course, a prosecutor may comment on a defendant's post-*Miranda* warnings statements "because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Anderson v. Charles,* 447 U.S. 404, 408, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222 (1980). Similarly, a

prosecutor may comment on a defendant's conduct and demeanor. *Mauro,* 159 Ariz. at 197–98, 766 P.2d at 70–71.

 Defendant mischaracterizes the prosecutor's statements. The prosecutor did not comment on defendant's post-arrest "failure to proclaim his innocence" or on defendant's post-arrest silence. The prosecutor did not say anything about defendant's silence after he received *Miranda* warnings. Instead, the prosecutor contrasted defendant's demeanor and statements that defendant made at the murder scene *before* he received any *Miranda* warnings with the demeanor and statements one would expect from a person who just discovered that his fianceè and his fianceè's daughter had been brutally murdered. Because the prosecutor did not comment on defendant's post-*Miranda* warnings silence, we find no error.

### C. Trial Court's Refusal to Re-read Instructions to the Jury

During jury deliberations, the jury sent a note to the judge asking whether both the prosecutor and the defense attorney, or just the prosecutor, decided not to call defendant to testify. Later, in chambers, the judge explained to counsel that he intended to answer the jury's question by saying, "[p]lease rely on the jury instructions in answering this question." Neither counsel objected, and the judge gave this answer to the jury.

The relevant jury instruction provided:

The State must prove all of its case against the Defendant with its own evidence. The Defendant is not required to testify. The decision whether to testify is left to the Defendant acting with the advice of an attorney. *You must not conclude that the Defendant is likely to be guilty because the Defendant does not testify. You must not let this choice affect your deliberations in any way.*

(Emphasis added.) The judge read this instruction to the jury when he initially instructed them; and pursuant to rule 22.2(b), Arizona Rules of Criminal Procedure, he also provided the jury with a written copy of the instruction.

Because defendant failed to object at trial, absent a finding of fundamental error, he waives the right to raise the issue on appeal. *See, e.g., State v. Gendron,* 168 Ariz. 153, 154, 812 P.2d 626, 627 (1991) (citations omitted). This court, in discussing fundamental error, has stated:

> Error is fundamental when it reaches "the foundation of the case or takes from the defendant a right essential to his defense" or is an "error of such dimensions that it cannot be said it is possible for a defendant to have had a fair trial."

*State v. King,* 158 Ariz. 419, 424, 763 P.2d 239, 244 (1988) (citations omitted).

Defendant now claims that the judge should have re-read this instruction to the jury, and that the judge's response constituted fundamental error because the jury's question implicated defendant's Fifth Amendment right not to testify in his own defense. We disagree.

 We agree that when "the jury appears to be confused about a legal issue, and the resolution of the question is not apparent from an earlier instruction, the trial judge has a 'responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria.' " *Des Jardins v. State,* 551 P.2d 181, 190 (Alaska 1976), quoting *Bollenbach v. United States,* 326 U.S. 607, 612–13, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946). In fact, rule 22.3, Arizona Rules of Criminal Procedure, specifically provides for such an eventuality:

> After the jurors have retired to consider their verdict, ... if they or any party request additional instructions, the court *may* recall them to the courtroom and ... give appropriate additional instructions.

(Emphasis added). The decision to further instruct a jury on a matter, however, is within the trial court's discretion. *See* rule 22.3, Arizona Rules of Criminal Procedure (discretionary term used); *State v. Dickey,* 125 Ariz. 163, 170, 608 P.2d 302, 309 (1980) (discussing discretionary nature of rule 22.3); *State v. Vaughn,* 200 Or. 275, 265 P.2d 249, 250 (1954) (citations omitted). Thus, "[w]hen a jury asks a judge about a matter on which it has received adequate instruction, the

judge may in his or her discretion refuse to answer, or may refer the jury to the earlier instruction." *Des Jardins,* 551 P.2d at 190; *see, e.g., State v. Hawkins,* 165 Mont. 456, 529 P.2d 1377, 1379 (1975) (citations omitted). In this case, we find that the judge did not abuse his discretion when, in response to the jury's question, he referred the jury back to the written instructions that he had provided them when he originally instructed the jury.

Defendant cites *Bollenbach v. United States,* 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946), and its progeny, in support of his argument. He argues that these cases stand for the proposition that jury questions should be clarified with concrete accuracy. *See Bollenbach,* 326 U.S. at 612–13, 66 S.Ct. at 405. We fail to see how *Bollenbach* and its progeny help defendant. In cases in which courts reversed a defendant's conviction, the courts did so because the original or supplemental instructions given were either inadequate or erroneous. *See, e.g., Bollenbach,* 326 U.S. at 613, 66 S.Ct. at 405 (supplemental instructions provided jury in response to question were "simply wrong"); *United States v. Nunez,* 889 F.2d 1564, 1569 (6th Cir.1989) (when asked whether law enforcement officer could be considered co-conspirator, judge merely re-read conspiracy instruction, which could have been interpreted by jury as "yes;" this was erroneous conclusion of law); *Freeman v. State,* 142 Ga.App. 293, 235 S.E.2d 560, 562 (1977) (conviction reversed when judge merely re-read burglary instruction in response to jury's question but failed to correct jury's erroneous belief that defendant could be guilty by association).

In this case, defendant does not claim that the jury received an inadequate or incorrect instruction. He virtually concedes that the written instructions were correct because he claims only that the judge should have re-read them and admonished the jury that it was improperly considering defendant's right not to testify. In this case, the judge complied with the dictates of *Bollenbach* by referring the jury back to the copies of the original instructions that it had received. The original instruction, in a clear and concise manner, not only answered the jury's question as to who decided that defendant would not testify, but it also advised the jury

that its members were not to consider defendant's failure to testify in their deliberations.

Moreover, defendant's fundamental error argument presumes that the jury improperly considered defendant's failure to testify because the judge did not re-read or reemphasize the relevant instruction in response to the jury's question. And, as we have repeatedly stated, "there is no presumption that jurors will disobey instructions given them by the court." *State v. Schad,* 129 Ariz. 557, 568, 633 P.2d 366, 377 (1981), citing *State v. Trujillo,* 120 Ariz. 527, 531, 587 P.2d 246, 250 (1978). Once directed by the judge to re-read the instructions in its possession, the jury asked no further questions. Thus, absent some evidence to the contrary, we presume that the jury read and followed the relevant instruction.

Based on these facts, we conclude that the trial judge did not abuse his discretion by referring the jury back to the written instructions provided. Thus, we find no basis for a finding of error, let alone fundamental error.

## III. *Sentencing Issues*

### A. *Constitutionality of A.R.S. § 13–703(C)*

Defendant challenges the constitutionality of § 13–703(C), which provides in part:

> In the sentencing hearing the court shall disclose to the defendant or defendant's counsel all material contained in any presentence report, if one has been prepared, *except such material as the court determines is required to be withheld for the protection of human life. Any presentence information withheld from the defendant shall not be considered in determining the existence or nonexistence of the circumstances included in subsection F [aggravating] or G [mitigating].*

(Emphasis added.) Defendant argues that because § 13–703 allows a trial court to withhold mitigating evidence, it violated his rights to: (1) compulsory process, which is guaranteed by the Sixth Amendment to the United States Constitution and art. 2, § 24 of the Arizona Constitution; (2) due process,

which is guaranteed by the Fourteenth Amendment to the United States Constitution and art. 2, § 4 of the Arizona Constitution; and (3) "open justice," which is guaranteed by art. 2, § 11 of the Arizona Constitution. Accordingly, defendant argues that this court should vacate his sentence and remand for resentencing. We disagree.

We begin by noting that defendant's claim that § 13–703 violates art. 2, § 11 of the Arizona Constitution is without merit. This provision has been aptly characterized as an "open courts" and "speedy trial" provision. John D. Leshy, *The Arizona State Constitution: A Reference Guide* 51 (1993). The "open courts" provision essentially commands public judicial proceedings. *See, e.g., Phoenix Newspapers Inc. v. Jennings,* 107 Ariz. 557, 561, 490 P.2d 563, 567 (1971) (discussing when right of public to observe court proceeding should be denied); *see also The Arizona State Constitution* 51 (discussing Arizona cases involving this provision) (citations omitted). This provision does not guarantee a defendant access to information that he or she desires. Any constitutional right to this information must be found elsewhere.

As defendant noted in his reply brief, this is not the first time a defendant has argued that § 13–703(C) violates a defendant's due process rights. A similar challenge was made in *State v. Gillies,* the relevant circumstances of which are factually indistinguishable from this case. 135 Ariz. 500, 507–08, 662 P.2d 1007, 1014–15 (1983). In that case, this court rejected the defendant's challenge that § 13–703(C) was unconstitutional on its face. *Gillies,* 135 Ariz. at 508, 662 P.2d at 1015. Defendant asks this court to revisit and overrule *Gillies.* Defendant offers no arguments that would cause us to reconsider the position that we adopted in *Gillies,* and thus we decline his invitation to revisit this issue.

Having previously found that § 13–703(C) is not facially invalid, we now consider whether defendant's due process rights were violated in this case.[5] As in

---

5. We analyze this argument only as a due pro- cess claim because the United States Supreme

*Gillies,* defendant's claim may be resolved with minimal discussion. We agree that "a defendant is [constitutionally] entitled to identify and compel the attendance of witnesses in his defense." *Hospital Corp. v. Superior Court,* 157 Ariz. 210, 214, 755 P.2d 1198, 1202 (App.1988); *see also Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963) (due process requires that state, upon request, disclose evidence favorable to accused if evidence is material to guilt or to punishment). And we also agree that this right extends to defendant's sentencing hearing. *See, e.g., United States v. Severson,* 3 F.3d 1005, 1013 (7th Cir.1993) ("*Brady* applies to sentencing"). Having said this, however, the court still finds that defendant has no claim for relief.

 Our rules require a trial judge to inform a defendant when information from presentence reports is withheld pursuant to § 13–703(C). Rule 26.6(c), Arizona Rules of Criminal Procedure; *Gillies,* 135 Ariz. at 508, 662 P.2d at 1015. Moreover, the trial court is presumed to know and follow the law. *Cf., State v. Warner,* 159 Ariz. 46, 52, 764 P.2d 1105, 1111 (1988) (trial court is presumed to know and apply rules of evidence). The trial judge, in the special verdict, specifically identified the additional material that he received into evidence and considered in sentencing defendant. The trial judge expressly stated that "all material in these presentence reports was disclosed to the Defendant and the Prosecutor." Despite this assertion, however, defendant argues that the court could have received another report that it chose not to disclose. Defendant does not cite anything in the record, and we have not found anything that supports defendant's conjecture. Moreover, it appears that neither trial nor appellate defense counsel asked the trial judge whether there was "another report" that was not disclosed. Because the record indicates that the judge disclosed all the information that he received and used in sentencing defendant, defendant's constitutional rights were not violated. Accordingly, defendant presents no claim for relief.

Court stated that the right to compulsory process provides no greater protection than that afforded by due process, *Pennsylvania v. Ritchie,* 480 U.S.

## B. *Independent Review of the Death Sentences*

 In every capital case, we independently review the record to determine the existence of both aggravating and mitigating circumstances. A.R.S. § 13–4035; *State v. Stevens,* 158 Ariz. 595, 598, 764 P.2d 724, 727 (1988); *State v. Richmond,* 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976). Additionally, this court must measure the weight accorded to each circumstance in determining whether the trial court properly imposed the death sentence. *State v. Lavers,* 168 Ariz. 376, 391, 814 P.2d 333, 348 (1991). We now undertake this review.

### 1. *Aggravating Circumstances*

The death penalty may be imposed only if the state has proved the existence of at least one aggravating factor beyond a reasonable doubt. *See* A.R.S. 13–703(E); *State v. Jordan,* 126 Ariz. 283, 286, 614 P.2d 825, 828 (1980).

 Here, the trial court found that the state had proved 3 aggravating circumstances: (1) that defendant was previously convicted of a violent felony in the United States, (2) that defendant committed the offense in an especially cruel, heinous, or depraved manner, and (3) that defendant committed multiple homicides during the commission of the offense. The court considered this last aggravating circumstance to support the death sentence on either Count I or Count II.

*Cruel, Heinous, or Depraved Manner.* Defendant contends that the trial court erred in finding that each murder was committed in an especially cruel, heinous, or depraved manner. He specifically argues that several findings of fact relating to the court's determination that the murder was committed in an especially heinous or depraved manner were not supported by evidence in the record.

 The terms especially "cruel," "heinous," or "depraved" are considered in the

39, 56, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987), and we hold that the same is true under the Arizona Constitution.

disjunctive; therefore, the presence of any one factor is sufficient to establish the aggravating circumstance under § 13–703(F)(6). *State v. Correll*, 148 Ariz. 468, 480, 715 P.2d 721, 733 (1986). In its special verdict, the trial court also found that the victims had been murdered in an "especially cruel" manner. Our independent review of the grisly facts of this case confirms that finding. We therefore need not address defendant's argument relating to whether sufficient evidence supported the trial court's finding of heinousness and depravity.

 Cruelty refers to the pain and suffering that the victim experiences before death. *State v. Amaya–Ruiz*, 166 Ariz. 152, 177, 800 P.2d 1260, 1285 (1990). Cruelty can be established by evidence of a prolonged, bloody struggle and the victim's defensive wounds. *See Amaya–Ruiz*, 166 Ariz. at 178, 800 P.2d at 1286; *State v. Lopez*, 163 Ariz. 108, 115, 786 P.2d 959, 966 (1990). Cruelty can also be established by evidence of the victim's awareness of suffering inflicted on a loved one. *State v. McCall*, 139 Ariz. 147, 161, 677 P.2d 920, 934 (1983). The victim's suffering must have been foreseeable to the defendant. *State v. Hinchey*, 165 Ariz. 432, 438, 799 P.2d 352, 358 (1990).

The victims in this case endured great pain and suffering over a prolonged period of time. The neighbors testified to the banging, screaming, cries for help, and running noises that alerted them to the homicides and that continued for 20 to 30 minutes. When the police arrived, they found evidence of great violence; they discovered blood and murder weapons throughout the apartment. Expert testimony as well as the physical evidence established that both victims were conscious during the time that defendant repeatedly stabbed each of them 15–20 times. Each was obviously aware of the other's suffering. Both sustained numerous other cuts and bruises. Mrs. G suffered defensive wounds while fighting unsuccessfully to save her life. The victims' sufferings were inescapably foreseeable to defendant. We believe the record in this case amply demonstrates

that these murders were especially cruel. Thus, the (F)(6) aggravating factor applies here on both counts.

Defendant did not challenge the trial judge's finding of aggravating factors under §§ 13–703(F)(2) and (F)(8), nor did he raise the issue on appeal. The existence of these factors is obvious to the court, but for the sake of avoiding a later challenge, we review these findings as well.

*Prior Felony Convictions.* The trial court found that the state proved the existence of an aggravating circumstance provided by § 13–703(F)(2).[6] Specifically, the trial court held that the state had proved beyond a reasonable doubt that defendant had been previously convicted of two felonies in the United States involving the use or threat of violence on another person.

 In reaching its conclusion, the trial court reviewed defendant's October 23, 1981 conviction for aggravated assault under §§ 13–1203(A)(2) and –1204(A)(2), and his August 13, 1979 conviction for robbery under § 13–1902. The court concluded that either conviction would be sufficient to meet the requirements of § 13–703(F)(2). We agree with the trial court's findings.

On October 23, 1981, defendant was convicted of aggravated assault, in violation of §§ 13–1203(A)(2) and –1204(A)(2). Section 13–1203(A)(2) provides:

A. A person commits assault by:

. . . .

2. Intentionally placing another person in reasonable apprehension of imminent physical injury; . . . .

Section 13–1204(A)(2) provides:

A. A person commits aggravated assault if such person commits assault as defined in § 13–1203 under any of the following circumstances:

. . . .

2. If such person uses a deadly weapon or dangerous instrument.

Reading the two statutes together, defendant was convicted of intentionally placing another

---

6. In its special verdict, the trial court considered the two qualifying convictions as one aggravating circumstance. The state does not raise, and we do not consider, whether two prior qualifying felony convictions should be considered as two aggravating circumstances.

person in reasonable apprehension of imminent physical harm by using a deadly weapon or dangerous instrument.

"[T]o constitute an aggravating circumstance under A.R.S. § 13–703(F)(2), the prior conviction must be for a felony *which by its statutory definition* involves violence or the threat of violence on another person." *State v. Romanosky*, 162 Ariz. 217, 228, 782 P.2d 693, 704 (1989), citing *Gillies*, 135 Ariz. at 511, 662 P.2d at 1018. Accordingly, "[i]f, under the statutory definition, the defendant could have committed and been convicted of the crime without using or threatening violence, the prior conviction may not qualify as a statutory aggravating circumstance under § 13–703(F)(2)." *Romanosky*, 162 Ariz. at 228, 782 P.2d at 704; *see State v. Fierro*, 166 Ariz. 539, 549, 804 P.2d 72, 82 (1990).

In *Fierro*, this court held that a conviction for aggravated assault under §§ 13–1203 and –1204 did not qualify as an aggravating circumstance under § 13–703(F)(2) because it was possible to commit aggravated assault under these two statutes without the use or threat of violence. 166 Ariz. at 550, 804 P.2d at 83. However, in this case, by specifying and proving the specific subsections under which defendant was convicted, the state avoided the result in *Fierro*. By their very terms, a conviction under §§ 13–1203(A)(2) and –1204(A)(2) necessarily involves violence or the threat of violence on another person, thus qualifying as a statutory aggravating circumstance under § 13–703(F)(2). *See Romanosky*, 162 Ariz. at 228, 782 P.2d at 704, citing *Gillies*, 135 Ariz. at 511, 662 P.2d at 1018. Defendant's conviction for aggravated assault, standing alone, is sufficient to support the court's finding of an aggravating circumstance under § 13–703(F)(2).

Moreover, as the trial court found, defendant's August 13, 1979 robbery conviction also supports the court's finding of an aggravating circumstance under § 13–703(F)(2). On August 13, 1979, defendant was convicted of robbery in violation of § 13–1902. That section defines robbery as follows:

A. A person commits robbery if in the course of taking any property of another from his person or immediate presence and against his will, such person threatens or uses force against any person....

By its terms, a person commits robbery by either threatening to use force or using force against any person. Because a robbery conviction under § 13–1902 involves violence or the threat of violence on another person, defendant's conviction can be used to prove a statutory aggravating circumstance under § 13–703(F)(2). *See, e.g., State v. Watson*, 120 Ariz. 441, 448, 586 P.2d 1253, 1260 (1978). Accordingly, we agree with the trial court's finding that the state proved the existence of an aggravating circumstance under § 13–703(F)(2).

*Multiple Homicides.* The trial court found that the state had proved beyond a reasonable doubt that the "defendant [had] been convicted of one or more other homicides ... which were committed during the commission of the offense." *See* A.R.S. § 13–703(F)(8). And, in its special verdict, the trial court stated that the finding of multiple homicides "is an aggravating circumstance that supports the imposition of a death sentence on either Count I or Count II."

We analyze " 'the temporal, spatial, and motivational relationships between the capital homicide and the collateral [homicide], as well as ... the nature of that [homicide] and the identity of its victim' " in determining whether the evidence supports a finding that a murder was committed during the commission of another murder. *Lavers*, 168 Ariz. at 393, 814 P.2d at 350, quoting Annotation, *Sufficiency of Evidence, for Death Penalty Purposes, To Establish Statutory Aggravating Circumstance That Murder Was Committed in Course of Committing, Attempting, Or Fleeing From Other Offense, and the Like—Post–Gregg Cases*, 67 A.L.R. 4th 887, 892, 894 (1989). Defendant was convicted of two counts of premeditated first-degree murder. The murders occurred in the same place and resulted from the same disturbance. Moreover, both murders "were committed by appellant in a relatively short period of time in what can be fairly viewed as one continuous course of criminal conduct." *Romine v. State*, 251 Ga. 208, 305 S.E.2d 93, 99 (1983). The record supports a finding

that each murder was committed during the commission of the other murder. Accordingly, we agree with the trial court's finding of the existence of an aggravating circumstance under § 13–703(F)(8). We note, however, that once proved, this aggravating factor applies to *each* first-degree murder conviction. *See State v. Greenway,* 170 Ariz. 155, 167–68, 823 P.2d 22, 34–35 (1991).

### 2. *Mitigating Circumstances*

Defendant must prove the existence of any mitigating factor by a preponderance of the evidence. *See* A.R.S. § 13–703(C); *Fierro,* 166 Ariz. at 551, 804 P.2d at 84. The trial court found that defendant proved the existence of one statutory mitigating circumstance and 7 non-statutory mitigating circumstances.

*Capacity.* The trial court found that defendant's "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. § 13–703(G)(1). Mickey McMahon, Ph.D., the psychologist who performed defendant's diagnostic evaluation, concluded:

I can state with reasonable psychological certainty that the defendant's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was significantly diminished. The cause of such diminished capacity is at least a combination of the defendant's psychological makeup, ... and the alcohol/cocaine intoxicated state he appears to have been in at the time of the offense. In addition, that intoxicated state was also affected by the more than 2 months of alcohol and cocaine abuse he underwent prior to the offense.

Because the record contains no evidence contradicting Dr. McMahon's findings, we agree with the trial court that defendant has proved the existence of the § 13–703(G)(1) circumstance.

*Non–Statutory Mitigating.* In addition to the mitigating circumstances specifically described in § 13–703(G), the sentencing judge must consider "any aspect of the defendant's character or record and any circumstance of the offense relevant to determining" whether the death penalty is appropriate. *McCall,* 139 Ariz. at 162, 677 P.2d at 935; *see* § 13–703(G). Accordingly, the trial court considered various factors that defendant presented in his sentencing memorandum. Among the matters offered by defendant to show that leniency was warranted in his case were: (1) his unstable family background, (2) his poor educational experience, (3) that he was the victim of sexual abuse while he was young, (4) his gang affiliation, (5) his excellent work record while in prison, (6) his remorse, (7) his chronic substance abuse, (8) his psychological history, and (9) his love of family. With the exception of defendant's remorse and excellent work record while in prison, the trial court treated all of the above-mentioned factors, including defendant's prior gang affiliation, as non-statutory mitigating factors.

Because the trial court considered defendant's gang affiliation as a mitigating factor, we assume, without deciding, that the trial court correctly found and considered this a nonstatutory mitigating factor, and we adopt that finding. We remind the courts, however, that although they must consider all evidence offered in mitigation, they are not bound to accept such evidence as mitigating. The trial court must make two determinations. First, did the defendant prove, by a preponderance of the evidence, the fact or circumstance—*i.e.,* that he had been affiliated with a gang. *See* A.R.S. § 13–703(C); *Fierro,* 166 Ariz. at 551, 804 P.2d at 84. Second, once the existence of the offered fact or circumstance has been established, the court must consider whether this fact or circumstance in some way is mitigating. *State v. McMurtrey,* 136 Ariz. 93, 102, 664 P.2d 637, 646 (1983). If the court finds that the fact or circumstance is mitigating, the court then should consider each mitigating circumstance *individually* and all mitigating circumstances *cumulatively* when weighing the mitigating and aggravating factors. *See State v. Gallegos,* 178 Ariz. 1, 870 P.2d 1097 (1994). Again, we refer the courts to *State v. Leslie,* 147 Ariz. 38, 50, 708 P.2d 719, 731 (1985), in which this court attempted to provide more precise guidance on this issue. In

132

*Leslie*, we stated that "the better practice is for the trial court to place, on the record, a list of all factors offered by a defendant in mitigation and then [provide] reasons for accepting or rejecting them." 147 Ariz. at 50, 708 P.2d at 731. As we said in *Gallegos*, "[t]his advice remains valid today, and moreover, it applies equally to both statutory and non-statutory mitigating circumstances." 178 Ariz. at 23, 870 P.2d at 1119.

■ Using the two-prong test discussed above to analyze the two factors that the trial court rejected, we agree with the trial court's rejection of defendant's remorse and excellent prison work record as mitigating factors. The trial court concluded that defendant failed to prove remorse by a preponderance of the evidence because the trial court found that defendant "has never admitted harming either victim and has shown no remorse for their deaths." Similarly, the trial court rejected defendant's offer of his excellent prison work record as mitigating because the court concluded that "[defendant's] overall performance as an inmate has been poor, as is evidenced by his escape conviction in CR–128529 and his going AWOL and being written up on several occasions, . . . ." Thus, defendant failed to meet the first of the two-prong test described above: he failed to prove that he was remorseful over the victims' deaths and that he had an excellent prison record. Having concluded that defendant failed to prove the fact or circumstance offered in mitigation, we do not reach the question of whether the fact or circumstance suggests that defendant should be treated with leniency. *See McMurtrey*, 136 Ariz. at 102, 664 P.2d at 646.

■ Finally, defendant argues for the first time on appeal that the state's failure to perform DNA testing should preclude the imposition of the death sentence. The state did not perform DNA tests on either the droplets of blood on Mrs. G's body, which appeared to have fallen straight down from their origin at a 90° angle, or on blood found on the wall outside the victims' apartment. Defendant argues that these tests could have conclusively proven whether defendant had in fact committed the murders. Therefore, according to defendant, the state's failure to

provide this testing should mitigate against the death sentence. Defendant is effectively claiming that there is some "residual doubt" as to his guilt, and argues that because the state could have resolved all question of defendant's guilt had it performed DNA tests, this court should reduce his sentence to life. We reject defendant's claim.

■ We begin by noting that the state "do[es] not have a constitutional duty to perform any particular tests." *Arizona v. Youngblood*, 488 U.S. 51, 59, 109 S.Ct. 333, 338, 102 L.Ed.2d 281 (1988). Moreover, after having reviewed the record in this case, we find no residual doubt about defendant's guilt. Thus, we find no merit in defendant's residual doubt argument.

### C. *Independent Weighing*

Our independent review of the record discloses no additional mitigating factors. We agree with the trial court that the state has proved the existence of aggravating factors under §§ 13–703(F)(2), (F)(6), and (F)(8). The aggravating circumstance regarding defendant's commission of a double murder, § 13–703(F)(8), is an aggravating factor as to each of the two counts. Having reviewed and considered all the mitigation evidence presented, both individually and cumulatively, we find it is not sufficiently substantial to call for leniency. We therefore find that the trial court properly imposed the death penalty on both counts.

### DISPOSITION

We have examined the record for fundamental error pursuant to A.R.S. § 13–4035 and have found none. Defendant's convictions and sentences are therefore affirmed.

FELDMAN, C.J., MOELLER, V.C.J., and ZLAKET and MARTONE, JJ., concur.