NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

———————————————

STATE OF ARIZONA, *Appellant,*

*v.*

ALFONSO BUSTOS, *Appellee.*

No. 1 CA-CR 14-0266
FILED 8-25-2015

———————————————

Appeal from the Superior Court in Maricopa County
No. CR2008-155348-001
The Honorable Phemonia L. Miller, Judge

**AFFIRMED**

———————————————

COUNSEL

Maricopa County Attorney's Office, Phoenix
By Amanda M. Parker
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Charles R. Krull
*Counsel for Appellee*

_____

**MEMORANDUM DECISION**

Presiding Judge Randall M. Howe delivered the decision of the Court, in which Judge Michael J. Brown and Judge Kent E. Cattani joined.

_____

**H O W E**, Judge:

¶1   The State appeals the trial court's order granting Alfonso Bustos' motion to suppress his blood results pursuant to the Fourth and Fifth Amendments to the United States Constitution. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2   Late one evening, two police officers were on car patrol. At an intersection, the officers saw Bustos weaving in and out of his lane. The officers followed and eventually stopped Bustos. One of the officers approached Bustos' vehicle, smelled alcohol on his breath, and noticed his red, bloodshot eyes. The officers arrested Bustos, took him to a DUI processing van, and then to a police station where a phlebotomist drew his blood.

¶3   At the subsequent evidentiary hearing to suppress Bustos' blood results, the DUI processing van officer testified about his interaction with Bustos. The van officer was parked at an intersection, and the arresting officers brought Bustos to him. The van officer read Bustos _Miranda_[1] warnings verbatim from a card and asked him if he understood them. Bustos replied, "Not really." The officer further explained the warnings, but Bustos "continued to say 'not really,'" and so the officer discontinued the interview. The van officer testified that Bustos invoked his rights to counsel and to remain silent.

¶4   The van officer proceeded to set up an Intoxilyzer 8000 and then held the tube to Bustos and asked him to blow. Bustos responded that he did not want to. The officer then read Bustos the implied consent affidavit verbatim, as Arizona's implied consent statute A.R.S. § 28–1321 required.  Once again, Bustos said that he did not want to take the test.

_____

[1]   _Miranda v. Arizona_, 384 U.S. 436 (1966).

¶5 Bustos then asked to speak to an attorney. The van officer told him that he could and offered a phone book or cell phone. Bustos made a call with his own phone, speaking in Spanish. The officer did not know if Bustos had spoken to an attorney. Based on Bustos' refusal to take the breath test, however, the officer started drafting a search warrant application. After the officer finished, he gave the application to the arresting officers, who then drove Bustos to the police station.

¶6 The phlebotomist who drew Bustos' blood also testified. He stated that when he arrived at the police station, Bustos was already in a holding cell. The arresting officers briefed the phlebotomist on the details of the arrest. The phlebotomist learned that Bustos had refused to comply with the breath test and that the van officer "was going to author" a search warrant application.

¶7 The phlebotomist also learned that Bustos had invoked his Fifth Amendment rights to counsel and to remain silent, which meant to the phlebotomist that the police should "stop [their] investigation, questioning-wise, and . . . wait it out." The phlebotomist nevertheless proceeded to ask the arresting officers if he could speak with Bustos. They agreed.

¶8 The phlebotomist testified that upon entering the cell, he introduced himself to Bustos, explained how the blood draw worked, showed Bustos the kit, and asked Bustos which needle he preferred. The phlebotomist then testified that Bustos—without prompting from him—said, "Okay, let's go do it." The phlebotomist then "clarified" whether Bustos meant that he wanted the phlebotomist to draw his blood. He further testified that he was not trying to get statements from Bustos or get Bustos to consent to a blood draw.

¶9 On cross-examination, the phlebotomist admitted that after asking Bustos some questions, he asked, "Hey, are you willing to go through a blood draw"—not that Bustos agreed to the blood draw without prompting from him. On redirect-examination, the State asked the phlebotomist to explain his previous statement; the phlebotomist said that his question about the blood draw was actually his clarifying question. But on recross-examination, defense counsel played a recording of the phlebotomist's interview where he said that after some "light chit-chat" with Bustos, he asked, "Hey, are you willing to go through a blood draw?" The State did not object to the recording or request that the entire recording be played or admitted to provide context under Arizona Rule of Evidence 106. On further redirect-examination, the phlebotomist spoke

hypothetically that after some light chit-chat, he would ask a suspect whether he was willing to have his blood drawn.

¶10        After some back and forth between the phlebotomist and Bustos, Bustos agreed to the blood draw. The phlebotomist drew Bustos' blood, and Bustos did not interfere with the investigation. Because Bustos consented, the search warrant application was not submitted, and no warrant was issued.

¶11        After reviewing the evidence, the trial court granted Bustos' motion and suppressed the blood results. The court noted that the phlebotomist's action "was deliberately conducted to circumvent [Bustos'] constitutional protections." It found that the phlebotomist's testimony lacked credibility and that his techniques and further questionings were not attempts to clarify, "but interrogation tactics designed to persuade [Bustos] to second guess his initial decision to invoke." The court concluded that Bustos had invoked his rights to counsel and to remain silent, that he did not waive those rights, and that the phlebotomist violated those rights. The court also concluded that the blood draw was conducted without a search warrant and that Bustos did not voluntarily and freely give his consent.

¶12        The State dismissed the case without prejudice and timely appealed the trial court's ruling on the motion to suppress.

**DISCUSSION**

¶13        The State argues that the trial court erred by granting Bustos' motion to suppress his blood results. We review a trial court's ruling on a motion to suppress for an abuse of discretion. *State v. Payne*, 233 Ariz. 484, 502 ¶ 42, 314 P.3d 1239, 1257 (2013). We defer to the trial court's determination of witness credibility and the reasonableness of their inferences drawn from the evidence, but we review the court's legal conclusions de novo. *State v. Baggett*, 232 Ariz. 424, 426 ¶ 7, 306 P.3d 81, 83 (App. 2013). We consider only the evidence presented at the suppression hearing and view the facts in the light most favorable to upholding the court's ruling. *State v. Yonkman*, 233 Ariz. 369, 371 ¶ 4, 312 P.3d 1135, 1137 (App. 2013). Because the evidence supports the trial court's ruling, the court did not abuse its discretion by granting Bustos' motion to suppress.

¶14        The State first contends that the phlebotomist did not violate Bustos' Fifth Amendment rights to counsel or to remain silent because Bustos was not subject to custodial interrogation for purposes of *Miranda*. Pursuant to the Fifth Amendment, *Miranda* warnings are required when a person is subject to custodial interrogation. *Edwards v. Arizona*, 451 U.S. 477,

485–86 (1981). A person is in custody when he is under arrest or when his "freedom of movement is restrained to a degree associated with formal arrest." *State v. Ramirez*, 178 Ariz. 116, 123, 871 P.2d 237, 244 (1994). Interrogation "includes both express questioning and words or actions that . . . the officer knows or reasonably should know are likely to have the force of a question on the accused . . . and therefore be reasonably likely to elicit an incriminating response." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (internal quotation marks and citation omitted).

¶15 Once *Miranda* warnings have been given and a person invokes his right to counsel or to remain silent, the interrogation must stop. *Miranda*, 384 U.S. at 473–74. "At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Id.*

¶16 The trial court did not err in finding that the phlebotomist violated Bustos' rights to counsel and to remain silent. Bustos was in custody because he was under arrest. *See Ramirez*, 178 Ariz. at 123, 871 P.2d at 244. Bustos was also subject to interrogation. Once the arresting officers transported Bustos to the police station, the phlebotomist assigned to draw his blood once the warrant was issued asked to speak with Bustos. The phlebotomist did so even knowing that Bustos had invoked his rights and had declined to give a breath sample. In contrast, when Bustos unequivocally invoked his right to remain silent and asked to speak with an attorney, the van officer respected Bustos' rights and ceased questioning him and — because he had declined to allow his breath to be tested — turned to drafting a search warrant application to seize a sample of Bustos' blood.

¶17 Although the phlebotomist testified on direct-examination that he only talked about the blood draw process with Bustos and was not trying to "get answers" from him, he admitted on cross-examination that he asked Bustos questions, including whether Bustos was willing to submit to a blood draw. And while the phlebotomist testified on redirect-examination that his questions were merely "clarifying," during a defense interview, he never mentioned that he asked questions for the sake of clarifying what Bustos meant.

¶18 Consequently, the trial court found that the phlebotomist lacked credibility and that his questions were not "attempts to clarify" as he later tried to explain in his testimony, but rather "interrogation tactics" to persuade Bustos to second guess his initial decision to invoke his Fifth Amendment rights. The State urges us to find that the trial court abused its

discretion in finding that the phlebotomist lacked credibility. We will defer to the trial court's assessment of the phlebotomist's credibility, however, because it is "in the best position to make that determination." *State v. Estrada,* 209 Ariz. 287, 292 ¶ 22, 100 P.3d 452, 457 (App. 2004); *see also Clark v. Renaissance West, LLC*, 232 Ariz. 510, 514 ¶ 19, 307 P.3d 77, 81 (App. 2013) (providing that this Court defers to the trial court's factual findings absent a clear abuse of discretion).

**¶19** The State further contends that regardless of the Fifth Amendment violations, Bustos consented to the blood draw. Under the Fourth Amendment, warrantless searches are per se unreasonable, subject only to a few established exceptions. *State v. Butler*, 232 Ariz. 84, 87 ¶ 12, 302 P.3d 609, 612 (2013). One long recognized exception is consent. *State v. Davolt*, 207 Ariz. 191, 203 ¶ 29, 84 P.3d 456, 468 (2004). Consent is valid only if voluntary, *Butler*, 232 Ariz. at 88 ¶ 18, 302 P.3d at 613, which is a question of fact determined from the totality of the circumstances, *Schneckloth v. Bustamonte*, 412 U.S. 218, 226–28 (1973). Even if a person consents to a search, evidence seized must still be suppressed "if the consent is tainted by a prior constitutional violation." *State v. Guillen*, 223 Ariz. 314, 317 ¶ 13, 223 P.3d 658, 661 (2010) (citing *Brown v. Illinois*, 422 U.S. 590, 602 (1975)).

**¶20** Suppression is not required, however, if the unconstitutional conduct is sufficiently attenuated from the subsequent seizure. *Id.* To determine whether the taint of the illegal conduct is sufficiently attenuated from evidence subsequently obtained by a consent, "we examine 1) whether *Miranda* warnings were administered; 2) the temporal proximity between the initial illegality and the defendant's consent; 3) whether there were intervening circumstances; and 4) the purpose and flagrancy of the official conduct." *Davolt*, 207 Ariz. at 203 ¶ 30, 84 P.3d at 468. The last factor "goes to the very heart and purpose of the exclusionary rule." *State v. Hummons*, 227 Ariz. 78, 81 ¶ 14, 253 P.3d 275, 278 (2011).

**¶21** Although Bustos consented to the blood draw by allowing the phlebotomist to take his blood without resisting, his consent was invalid. It was tainted by the prior Fifth Amendment violations and could not provide a sufficient basis for the police to draw Bustos' blood. As discussed, Bustos was advised of his *Miranda* rights and he invoked his Fifth Amendment rights to counsel and to remain silent. The temporal proximity between the custodial interrogation and his consent was less than one hour. "This time period alone is insufficient to break the causal chain." *Davolt*, 207 Ariz. at 203 ¶ 31, 84 P.3d at 468. Moreover, no intervening events broke the chain between the improper questioning and consent, such as "a subsequent

release from custody, an appearance before a magistrate, discussions with a lawyer, or a subsequent conviction on unrelated charges." *Id.* at ¶ 32.

**¶22** Finally, the phlebotomist's conduct was "purposeful and flagrant." *Id.* at ¶ 30. Although the phlebotomist knew that Bustos had invoked his Fifth Amendment rights, he nevertheless entered Bustos' cell and questioned him. Unlike the van officer, who immediately ceased questioning after Bustos invoked his rights and proceeded to draft the warrant application—as the law requires—the phlebotomist asked the arresting officers if he could speak with Bustos. After chit-chatting with Bustos, the phlebotomist asked him if he would give his blood. The trial court, who heard and observed the phlebotomist's testimony and demeanor, found that he lacked credibility, specifically when he said that Bustos, without prompting from him, said, "[L]et's go do this," that is, "Let's do the blood draw." But Busto did not make that statement—if he made it at all—without prompting from the phlebotomist.

**¶23** Further, the phlebotomist knew the lawful procedure after a suspect invokes his Fifth Amendment rights. The phlebotomist testified that once a suspect has invoked those rights, the police should "stop [their] investigation, questioning-wise, and . . . wait it out." Consequently, on these facts, Bustos' consent was tainted by the prior Fifth Amendment violations and could not provide a sufficient basis for the police to draw his blood.

**¶24** The State counters that Bustos' blood would have inevitably been drawn pursuant to a warrant. "Illegally obtained physical evidence may be admitted if the State can demonstrate by a preponderance of the evidence that such evidence inevitably would have been discovered by lawful means." *Id.* at 204 ¶ 35, 84 P.3d at 469. But here, the State has not proven that Bustos' blood inevitably would have been obtained lawfully. The record shows that despite having drafted a search warrant application, the police did not submit the application, and therefore, no court issued a warrant for Bustos' blood. Consequently, the blood draw violated the Fourth Amendment as an unconstitutional search, and the evidence obtained was correctly suppressed. The trial court did not abuse its discretion in granting Bustos' motion.

**CONCLUSION**

¶25        For the foregoing reasons, we affirm.



Ruth A. Willingham · Clerk of the Court
FILED: ama