11 P.3d 1012

Merlin Lyneer CLOUSE, individually, as surviving spouse of Norma Clouse and on behalf of Guy Michael Clouse, surviving son of Norma Clouse; Guy Michael Clouse, individually; Lisandro and Salinas and Debra Maria Salinas, individually and as husband and wife; Amber Salinas, Lissandra Salinas and Nathaniel Salinas, minor children of Lisandro Salinas, Plaintiffs–Appellants,

v.

STATE of Arizona, DEPARTMENT OF PUBLIC SAFETY, A.E. Dobbins, Defendants–Appellees.

Merlin Lyneer Clouse, individually as surviving spouse of Norma Clouse and on behalf of Guy Michael Clouse, surviving son of Norma Clouse; Guy Michael Clouse, individually; Lisandro Salinas and Debra Maria Salinas, individually and as husband and wife; Amber Salinas, Lissandra Salinas and Nathaniel Salinas, minor children of Lisandro Salinas, Plaintiffs–Appellees,

v.

State of Arizona, Department of Public Safety; Maricopa County; and Andrew Dobbins, Defendants–Appellants.

No. CV–99–0023–PR.

Supreme Court of Arizona, En Banc.

Oct. 17, 2000.

Reconsideration Denied Jan. 9, 2001.

Coppersmith, Gordon, Schermer, Owens & Nelson, P.L.C. by Andrew S. Gordon, and Kristen B. Rosati, Phoenix, Attorneys for Plaintiffs Clouse and Salinas.

Janet Napolitano, The Attorney General by John E. Birkemeier, Assistant Attorney General and Richard F. Albrecht, Assistant Attorney General, and Thomas J. Dennis, Assistant Attorney General, and Randall M. Howe, Assistant Attorney General, Phoenix, Attorneys for the State of Arizona and Dobbins.

The Langerman Law Offices by Amy G. Langerman, Phoenix, Attorneys for Amicus Curiae, Arizona Trial Lawyers Association.

Jones, Skelton & Hochuli by David C. Lewis, Phoenix, Attorneys for Amicus Curiae City of Phoenix and Arizona County Supervisors Association.

Law Offices of David R. Merkel by David R. Merkel, Tempe, Attorneys for Amicus Curiae League of Arizona Towns and Cities.

Copple, Chamberlin, Boehm & Murphy, P.C. by Scott E. Boehm, Phoenix, Attorneys for Amicus Curiae City of Scottsdale.

## OPINION

McGREGOR, Justice.

¶ 1 We accepted review to decide whether the legislature exceeded its constitutional authority when it adopted Arizona Revised Statutes Annotated (A.R.S.) section 12–820.02.A.1, which provides qualified immunity to public entities and employees for an employee's failure to retain an arrested person in custody. We conclude that the legislature acted within the power granted it by article IV, part 2, section 18 of the Arizona Constitution.

## I.

¶ 2 On April 29, 1995, David Van Horn stole David Oakes' truck in Maricopa County, Arizona and fled toward Pinal County. Mr. Oakes' son-in-law, David Ahrendt, pursued Van Horn. After they entered Pinal County, Van Horn attempted to kill Ahrendt by running him down with the stolen truck. Shortly thereafter, Department of Public Safety (DPS) Officer Andrew Dobbins arrested Van Horn in Pinal County. Meanwhile, Maricopa County Sheriff's Office (MCSO) Deputy Robert Judd took the theft report in Maricopa County.

¶ 3 After talking with Deputy Judd, Officer Dobbins understood that Van Horn would be prosecuted in Maricopa County. Unfortunately, neither officer filed an arrest report. On May 4, a MCSO van arrived to transport another inmate from Pinal County to Maricopa County. Officers placed Van Horn,

against whom no criminal complaint had yet been filed, in the van. When the two deputies transporting Van Horn realized that he was being held unlawfully,[1] they released him on the side of the highway. Van Horn then stole another vehicle, and with a companion, Diane Wilson, drove to New Mexico, where he committed several violent crimes.

¶ 4 Together, Van Horn and Wilson invaded the home of the Clouses, and abused and terrorized them. They then set fire to the home and watched it burn with the Clouses still inside. Mrs. Clouse died; Mr. Clouse survived. In the ensuing manhunt, Van Horn shot Deputy Lisandro Salinas, a New Mexico peace officer, who survived.

¶ 5 Mr. Clouse and his son, and Deputy Salinas and his wife and children, sued the State of Arizona and Maricopa County, alleging that their officers were negligent and grossly negligent in failing to retain Van Horn in custody. As a defense, the defendants invoked A.R.S. section 12–820.02.A.1, which requires proof of gross negligence on this claim.[2] Plaintiffs then moved for partial summary judgment, arguing that because the statute eliminates simple negligence claims, it violates the anti-abrogation clause of the Arizona Constitution. *See* ARIZ. CONST. art. XVIII, § 6. The trial judge denied the motion. At the close of evidence, the court submitted the claims against the county and state defendants to the jury with only a gross negligence instruction.

¶ 6 The jury found against the county defendants and in favor of the state defendants.[3] On review, the court of appeals agreed that A.R.S. section 12–820.02.A.1 does not violate the anti-abrogation clause. Plaintiffs then petitioned this court for review.

¶ 7 We have jurisdiction pursuant to article VI, section 5.3 of the Arizona Constitution, Rule 23 of the Arizona Rules of Civil Appellate Procedure, and A.R.S. section 12–120.24.

---

1. *See* ARIZ.R.CRIM P. 4.1(b) ("If a complaint is not filed within 48 hours from the time of the initial appearance before the magistrate, the defendant shall be released....").

2. A.R.S. § 12–820.02.A.1 (West Supp.1999) provides:

   A. Unless a public employee acting within the scope of the public employee's employment intended to cause injury or was grossly negligent, neither a public entity nor a public employee is liable for: .

   1. The failure to make an arrest or the failure to retain an arrested person in custody.

3. The jury apportioned no fault to the state; 15 percent to the county; 50 percent to Van Horn; and 35 percent to Van Horn's companion.

## II.

### A.

¶ 8 The doctrine of sovereign immunity precludes bringing suit against the government without its consent. It loosely reflects the ancient principle that "the King can do no wrong," and bars holding the state or its political subdivisions liable for the torts of its officers or agents unless the government expressly waives its immunity.[4] As all parties agree, at the time Arizona adopted its constitution, "the state, in consequence of its sovereignty, [was] immune from prosecution in the courts and from liability to respond in damages for negligence, except in those cases where it [had] expressly waived immunity or assumed liability by constitutional or legislative enactment." *State v. Sharp*, 21 Ariz. 424, 426, 189 P. 631, 633 (1920).

¶ 9 Governmental immunity retained its place in Arizona law until 1963. In *Stone v. Arizona Highway Commission*, 93 Ariz. 384, 381 P.2d 107 (1963), convinced that the doctrine had become unjust and outmoded and that its application created many inequities, this court abolished the substantive defense of governmental immunity. *Id.* at 392, 381 P.2d at 112.

¶ 10 At that point, plaintiffs assert, negligence actions against the government gained the protection of the anti-abrogation clause,[5] and any future legislative attempt to abolish an action against the state under the guise of affording immunity would violate the Arizona Constitution. The state contends, first, that the anti-abrogation clause does not apply to actions against the sovereign. Alternatively, the state argues, a more specific provision of the constitution, article IV, part 2, section 18 (the immunity clause) empowers the legislature to enact the challenged statute.

¶ 11 "It is an established axiom of constitutional law that where there are both general and specific constitutional provisions relating to the same subject, the specific provision will control." *de'Sha v. Reed*, 194 Colo. 367, 572 P.2d 821, 823 (1977). The language of the anti-abrogation clause applies generally to "the right of action to recover damages for injuries." The immunity clause, on the other hand, applies only and specifically to "suits brought against the State." Under such circumstances, the

> "'general provision is controlled by one that is special, the latter being treated as an exception to the former. A specific provision relating to a particular subject will govern in respect to that subject, as against a general provision, although the latter, standing alone, would be broad enough to include the subject to which the more particular provision relates.'"

*Miller v. Superior Court*, 21 Cal.4th 883, 89 Cal.Rptr.2d 834, 986 P.2d 170, 177 (1999) (quoting *San Francisco Taxpayers Ass'n v. Board of Supervisors*, 2 Cal.4th 571, 7 Cal. Rptr.2d 245, 828 P.2d 147 (1992)). Because the immunity clause directly addresses the authority of the legislature in relation to actions against the state, we resolve the issue before us by applying the immunity clause.

### B.

¶ 12 In *Ryan v. State*, 134 Ariz. 308, 656 P.2d 597 (1982), we considered how to define the parameters of the state's immunity. We proposed "endors[ing] the use of governmental immunity as a defense only when its application is necessary to avoid a severe hampering of governmental function or [a] thwarting of established public policy." *Id.* at 311, 656 P.2d at 600. We also invited the legislature to address those areas that might need the protection of absolute immunity or qualified immunity. *Id.* at 310, 656 P.2d at 599 ("[T]he legislature may in its wisdom

---

4. For a complete discussion of the background of the doctrine of sovereign immunity and its use in Arizona, see *Stone v. Arizona Highway Comm'n*, 93 Ariz. 384, 381 P.2d 107 (1963).

5. Arizona's anti-abrogation clause, also referred to as an "open courts" provision, states: "The right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation." ARIZ. CONST. art. XVIII, § 6. *See also* ARIZ. CONST. art. II, § 11 ("Justice in all cases shall be administered openly, and without unnecessary delay."). Article II, section 11, has also been characterized as an "open courts" and "speedy trial" provision. *See State v. Ramirez*, 178 Ariz. 116, 127, 871 P.2d 237, 248 (1994).

wish to intervene in some aspects of this development.").

¶ 13 In response to that invitation, in 1984 the legislature adopted the Actions Against Public Entities or Public Employees Act, which is codified at A.R.S. sections 12–820 to 12–826. "The legislation provides for absolute immunity, qualified immunity, and affirmative defenses in favor of public entities and public employees. The level of immunity or affirmative defense available to a public employee in a particular action depends upon the nature of the activity giving rise to the potential liability." James L. Conlogue, Note, *A Separation of Powers Analysis of the Absolute Immunity of Public Entities*, 28 ARIZ.L.REV. 49, 49 (1986).

¶ 14 The legislature's decision to codify the doctrine of sovereign immunity was consistent with the approach taken in other jurisdictions. Although most states have waived their sovereign immunity, either through judicial abrogation or legislative waiver, all fifty states have enacted some form of a "Tort Claims Act" to define, and sometimes to reestablish, the parameters of governmental liability. *See* 57 AM.JUR. 2d *Municipal, County, School, and State Tort Liability* § 129 (1988). Similarly, the federal government waived its sovereign immunity, but then enacted a form of governmental immunity by adopting the Federal Tort Claims Act. *See generally* 28 U.S.C.A. §§ 1291, 1346, 1402, 2401, 2402, 2411, 2412, 2671 to 2680. In all these instances, the legislative branch reenacted some form of governmental

immunity after the doctrine was "abolished," either judicially or legislatively.

¶ 15 If the Arizona Legislature has authority to define those areas in which absolute or qualified immunity protects public entities and employees from liability, its authority derives from the immunity provision, article IV, part 2, section 18, of the Arizona Constitution. That provision states: "The Legislature shall direct by law in what manner and in what courts suits may be brought against the state." We have not had reason to consider the extent of the legislature's authority under the immunity provision, and because the drafters of the constitution did not debate this provision, we have no history to guide us. *See generally* THE RECORDS OF THE ARIZONA CONSTITUTION OF 1910 (John S. Goff ed., n.d.) Decisions from our sister jurisdictions, however, provide guidance.

¶ 16 Eighteen other state constitutions contain language identical or similar to Arizona's immunity provision.[6] As far as we can determine, every jurisdiction that has construed such a constitutional immunity clause has held that the provision gives the legislature authority to determine the scope of governmental immunity. The majority of those states with a similar provision have concluded that this language "constitutionalizes" the doctrine of sovereign immunity and confers upon the legislature the exclusive authority to waive sovereign immunity and that, absent legislative action, suits against the state cannot proceed.[7]

---

6. *See* ALASKA CONST. art. II, § 21; DEL. CONST. art. I, § 9; FLA CONST. art. X, § 13; GA. CONST. art. I, § II, P. IX; IND. CONST. art. 4, § 24; KY. CONST § 231; NEB. CONST. art. V, § 22; NEV. CONST. art. 4, § 22; N.Y. CONST. art. VI, § 18.b; OHIO CONST. art. I, § 16; OR. CONST. art. IV, § 24; PA. CONST. art. I, § 11; S.C. CONST. art. X, § 10; S.C. CONST art. XVII, § 2; S.D. CONST. art. III, § 27; TENN. CONST. art. I, § 17; WA. CONST. art. II, § 26; WIS. CONST. art. IV, § 27; WYO. CONST. art. 1, § 8.

7. *See, e.g., Alaska v. O/S Lynn Kendall,* 310 F.Supp. 433, 434 (D.Alaska 1970) ("The Constitution of the State of Alaska grants to the Legislature the sole and exclusive power to enact laws establishing the terms and conditions upon which the State may be sued."); *Turnbull v. Fink,* 668 A.2d 1370, 1374 (Del.1995) (holding that article I, § 9 of Delaware's Constitution provides that the only way the state's sovereign immunity may be waived is by an act of the

General Assembly); *Donisi v. Trout,* 415 So.2d 730, 730 (Fla.Dist.Ct.App.1981) ("Article X, § 13 of the Florida Constitution provides that the sovereign immunity of the state may be waived only by general law. Since the power to waive the state's immunity is vested exclusively in the Legislature, a city may not waive sovereign immunity by local law."); *Porter v. Home Indem. Co.,* 168 Ga.App. 799, 310 S.E.2d 546, 547 (1983) ("Governmental immunity from suit is waived only when so provided by the Constitution or by the express act of the General Assembly."); *Kentucky Center for the Arts, Corp. v. Berns,* 801 S.W.2d 327, 329 (Ky.1990) (Section 231 has been "interpreted through the years to constitutionalize the common law doctrine of sovereign immunity in suits brought against the Commonwealth."); *Schrader v. Veatch,* 216 Or. 105, 337 P.2d 814, 816 (1959) (immunity from suit is a sovereign right subject to waiver only by legisla-

¶ 17 Washington, for instance, adopted its constitution in 1895 and included an immunity clause identical to that later used in the Arizona Constitution. *See* WASH. CONST. art. II, § 26. Washington has construed its immunity provision on several occasions and, because we adopted many of our provisions from the Washington Constitution, the judicial decisions of that state can be persuasive, although not controlling.[8] Like Arizona, Washington followed the common law doctrine of sovereign immunity. *See Deaconess Hosp. v. Washington State Highway Comm'n*, 66 Wash.2d 378, 403 P.2d 54, 59 (1965). The Washington Supreme Court explicitly recognized the power over sovereign immunity conferred upon the legislature by its constitution: " 'This state has by its Constitution (art. II, § 26) empowered the Legislature to direct by law in what manner and in what courts suits may be brought against it....' " *Id.* at 60 (quoting *State ex rel. Pierce County v. Superior Court*, 86 Wash. 685, 151 P. 108 (1915)). Relying upon article II, section 26 of the Washington Constitution,

the Washington court held that the right to sue the state is a matter of legislative grace. *See Haddenham v. Washington*, 87 Wash.2d 145, 550 P.2d 9, 12 (1976); *see also, e.g., Cook v. Washington*, 83 Wash.2d 599, 521 P.2d 725, 727 (1974) (referring to the legislative obligation to control and condition suits against the state as commanded by article II, section 26 of the Washington Constitution); *Andrews v. Washington*, 65 Wash.App. 734, 829 P.2d 250, 251–52 (1992) ("[W]e start with the proposition that the abolition of sovereign immunity is a matter within the legislature's determination. This is not because the court says so, but because the constitution so states.").

¶ 18 In other states, including Arizona, the court, rather than the legislature, abolished the judicially-created doctrine of sovereign immunity. In many of these states, the respective state legislatures reinstated some form of governmental immunity under the authority of constitutional language similar to article IV, part 2, section 18 of the Arizona Constitution.[9] In each instance, the state

tive determination); *Arcon Constr. Co. v. South Dakota Cement Plant*, 349 N.W.2d 407, 410 (S.D. 1984) ("[W]e have consistently held that it is the exclusive province of the legislature and not the courts to abrogate or limit the doctrine of sovereign immunity."); *Austin v. City of Memphis*, 684 S.W.2d 624, 637 (Tenn.Ct.App.1984) ("The rule of sovereign immunity in Tennessee is both constitutional and statutory. It is not within the power of the courts to amend it."); *Haddenham v. Washington*, 87 Wash.2d 145, 550 P.2d 9, 12 (1976) ("Prior to the legislature's abolition of the doctrine of sovereign immunity, tort claimants had no right to sue the state. The plaintiff's right to sue the state for the state's tortious conduct is therefore a matter of legislative grace."); *Vigil v. Ruettgers*, 887 P.2d 521, 524 (Wyo.1994) ("We have repeatedly held that Wyo. Const. art. 1, § 8 requires explicit legislative authorization before a suit can be maintained against the state.").

8. *See Solana Land Co. v. Murphey*, 69 Ariz. 117, 124, 210 P.2d 593, 597 (1949) ("While the opinion from the Supreme Court of Washington is not controlling, it is peculiarly persuasive both by reason of its sound reasoning as well as the fact that our constitutional provision on eminent domain was obviously copied from the constitution of that state."); *see also State v. Reinhold*, 123 Ariz. 50, 56, 597 P.2d 532, 538 (1979) (construing article VI, section 27, of the Arizona Constitution and according deference to recent cases from the State of Washington interpreting an identical provision of its state constitution); *Faires v. Frohmiller*, 49 Ariz. 366, 371–72, 67

P.2d 470, 472 (1937) (construing article VI, the court held that the decisions from Washington and California, so far as they declare or indicate the views in those jurisdictions on the question at issue, are very persuasive), *superseded by statute as stated in Ward v. Stevens*, 86 Ariz. 222, 344 P.2d 491 (1959); *Bickel v. Hansen*, 169 Ariz. 371, 374, 819 P.2d 957, 960 (App.1991) (noting that decisions from the State of Washington are persuasive while construing article II, section 17 of the Arizona Constitution); *Gulotta v. Triano*, 125 Ariz. 144, 146, 608 P.2d 81, 83 (App.1980) (same).

9. *See, e.g., City of Wilmington v. Spencer*, 391 A.2d 199 (Del.1978), *superseded by statute and rule as stated in Porter v. Delmarva Power & Light Co.*, 488 A.2d 899, 901–02. (Del.Super.Ct.1984); *Hargrove v. Town of Cocoa Beach*, 96 So.2d 130 (Fla.1957), *superseded by statute as stated in Cauley v. City of Jacksonville*, 403 So.2d 379, 383–84 (Fla.1981); *Campbell v. Indiana*, 259 Ind. 55, 284 N.E.2d 733 (1972), *superseded by statute as stated in Holtz v. Board of Comm'rs of Elkhart County*, 548 N.E.2d 1220, 1220 (Ind.Ct.App. 1990) ("The Tort Claims Act was enacted by the legislature in 1974, in response to the [judicial] abrogation of the defense of sovereign immunity."), *overruled on other grounds by* 560 N.E.2d 645 (Ind.1990); *Brown v. City of Omaha*, 183 Neb. 430, 160 N.W.2d 805, 808 (1968) (stating that both the court and the legislature have the authority to waive sovereign immunity); *Concerned Citizens of Kimball County, Inc. v. Depart-*

court concluded that the immunity clause granted the legislature authority over the scope of the state's immunity, and upheld the statute adopted by the legislature.

¶ 19 Until our decision in *Stone*, this court had refused invitations to abolish the doctrine of sovereign immunity, holding that the authority to do so rested solely with the legislature. *See, e.g., Lee v. Dunklee*, 84 Ariz. 260, 263–64, 326 P.2d 1117, 1119 (1958) ("[W]hether the doctrine of governmental immunity should be modified in this state is a legislative question and such policy should be declared and the extent of liability definitely fixed by that body and not by judicial fiat."). Our decision in *Stone* gives no indication that the parties asked us to consider whether article IV, part 2, section 18 limited our authority to abolish sovereign immunity, although we did consider the actions of other jurisdictions that had judicially abolished the doctrine. *See Stone*, 93 Ariz. at 390–92, 381 P.2d at 113–15. Neither in *Stone* nor in any other decision did we address the issue we consider today.

¶ 20 Although we have never addressed explicitly whether the immunity clause permits the legislature to define those instances in which governmental immunity prevents or limits actions against the state, we have done so implicitly. In a long line of cases handed down after *Stone*, we have enforced statutes that confer either absolute or qualified immunity upon public entities. Although our decisions since *Stone* follow a somewhat circuitous route, we have never suggested that *Stone* prohibits all forms of governmental immunity. To the contrary, we consistently have recognized the power of the legislature to retain or confer immunity where appropriate.

¶ 21 In our first detailed analysis of governmental immunity after *Stone*, we considered whether members of the Board of Pardons and Paroles should receive partial or absolute immunity for their allegedly negligent act of releasing a prisoner who, while on parole, murdered one man and shot another. *See Grimm v. Arizona Bd. of Pardons & Paroles*, 115 Ariz. 260, 564 P.2d 1227 (1977). Rejecting the approach earlier taken by the court of appeals,[10] we held that public officials performing discretionary functions other than true judicial functions are not necessarily entitled to absolute immunity. *Id.* at 264, 564 P.2d at 1231. We did not, however,

*ment of Envtl. Control*, 244 Neb. 152, 505 N.W.2d 654, 658 (1993) ("Article V, § 22, is not self-executing. Legislative action is necessary to waive the state's sovereign immunity."); *Nevada v. Silva*, 86 Nev. 911, 478 P.2d 591, 593 (1970) ("The trend was toward the judicial abolition of that doctrine. It is only fair to assume that the 1965 Legislature reacted to that trend, and elected to waive immunity within limits and impose a ceiling upon the recovery allowable to a claimant, rather than await further judicial action upon the subject."); *Krause v. Ohio*, 31 Ohio St.2d 132, 285 N.E.2d 736, 743 (1972) (Ohio courts have found that art. I, § 16, is not self-executing, and statutory consent is a prerequisite to such suits. It does not authorize actions against the state, but empowers the legislature to enact legislation providing for suits against the state.); *Tabernacle Prayer Church v. City of Columbus*, 114 Ohio App.3d 673, 683 N.E.2d 873, 874 (Ct.App.1996) ("Appellant is correct that [Ohio courts] abolished, to a large extent, the defense of sovereign immunity as applied to municipal corporations; however, subsequent to those decisions the legislature enacted R.C. Chapter 2744, which restored governmental immunity to municipal corporations subject to certain exceptions."); *Ayala v. Philadelphia Bd. of Pub. Educ.*, 453 Pa. 584, 305 A.2d 877 (1973) *superseded by statute as recognized in Michel v.*

*City of Bethlehem*, 84 Pa.Cmwlth. 43, 478 A.2d 164, 165 (1984) ("[T]he Pennsylvania Supreme Court abrogated the doctrine of governmental immunity in Pennsylvania. In response, the Pennsylvania Legislature, pursuant to Article I, Section 11 of the Pennsylvania Constitution, enacted the Political Subdivisions Tort Claims Act."); *McCall v. Batson*, 285 S.C. 243, 329 S.E.2d 741 (1985), *superseded by statute as recognized in Murphy v. Richland Mem. Hosp.*, 317 S.C. 560, 455 S.E.2d 688, 690 (1995) ("In response to our decision in *McCall*, the legislature implemented a comprehensive act providing for the logical disposition of governmental liability."); *Holytz v. Milwaukee*, 17 Wis.2d 26, 115 N.W.2d 618 (1962), *superseded by statute as recognized by Nielsen v. Town of Silver Cliff*, 112 Wis.2d 574, 334 N.W.2d 242, 244 (1983) ("Shortly after the *Holytz* decision, the legislature enacted [a tort claims act, which] established liability limitations and notice requirements for tort actions against local units of government."); *see also* 57 AM.JUR.2D *Municipal, County, School, and State Tort Liability* §§ 19, 29 & 129 (1988).

10. *See Industrial Comm'n v. Superior Court*, 5 Ariz.App. 100, 423 P.2d 375 (1967) (holding that administrative officials are immune from suit for activities performed while acting in a discretionary, quasi-judicial capacity).

hold or even suggest that litigants can pursue actions alleging governmental negligence without regard to the doctrine of immunity. Rather, we recognized that the then current version of A.R.S. section 31–412 provided support for awarding partial immunity. *See id.* at 265, 564 P.2d at 1232 ("The board members should not bear liability for taking the risk allocated to them as a statutory duty."). We then established a new test for determining whether public officials would benefit from immunity and adopted what became known as the public/private duty distinction.[11] We also held, however, that while the members of the Board of Pardons and Paroles would receive only partial immunity from suit, they could be held liable "only for grossly negligent or reckless acts." *Id.* at 267, 564 P.2d at 1234. In other words, we approved a standard for liability comparable to that which the plaintiffs challenge here, as established by the legislature in A.R.S. section 12–820.02.

¶ 22 Similarly, in *Ryan v. State,* after considering the circumstances under which this court would afford immunity, we noted that what was then A.R.S. section 41–621.G should allay any fear that people would be afraid to operate in their official capacities, because the statute gave "state officers, agents and employees immunity from personal liability for discretionary acts done 'in good faith without wanton disregard of his statutory duties.'" 134 Ariz. at 310, 656 P.2d at 599. We did not suggest that the legislature acted improperly in granting partial immunity under the circumstances defined in the statute or that future attempts by the legislature to act similarly would be invalid. In fact, as noted above, we expressly invited the legislature to address those areas that

might need the protection of absolute or qualified immunity. *Id.*

¶ 23 The Arizona Court of Appeals also frequently has considered and applied statutes affording immunity without suggesting that the legislature lacked power to adopt such statutes.[12] All these decisions implicitly support the view we make explicit today.

**C.**

¶ 24 We conclude that the immunity clause, by authorizing the legislature to direct by law the manner in which suits may be brought against the state, confers upon the legislature a power to control actions against the state that it does not possess with regard to actions against or between private parties. We further hold that the legislature did not exceed the authority granted it by article IV, part 2, section 18 when it adopted A.R.S. section 12–820.02.A.

¶ 25 Our conclusion does not mean, as the dissent avers, that the legislature is now "empowered to do anything it wants with regard to the grant of absolute or partial immunity to public entities (whatever that means), to public employees of those entities (whatever that includes), and to heaven knows who and what else." *Infra* ¶ 79 (parentheticals in original). Rather, we recognize nothing more than the express authority the Arizona Constitution confers upon the legislature to define those instances in which public entities and employees are entitled to immunity. The legislature possesses this authority not because we say so, but because our Constitution so directs.

¶ 26 In this case, the plaintiffs' allegations that the defendants negligently failed to

---

11. Under that approach, a public entity could be sued if it violated a duty owed to an individual member of the public, but not if it violated a duty owed to the general public. *Grimm v. Arizona Bd. of Pardons & Paroles,* 115 Ariz. 260, 267, 564 P.2d 1227, 1234 (1977).

12. *See, e.g., Link v. Pima County,* 193 Ariz. 336, 972 P.2d 669 (App.1998) (applying A.R.S. section 12–820.01); *Luchanski v. Congrove,* 193 Ariz. 176, 971 P.2d 636 (App.1998) (upholding qualified immunity statute in the context of self-injured arrestee); *de la Cruz v. State,* 192 Ariz. 122, 961 P.2d 1070 (App.1998) (discussing, but not

applying, absolute and qualified immunity under A.R.S. section 12–820); *Diaz v. Magma Copper Co.,* 190 Ariz. 544, 950 P.2d 1165 (App.1997) (rejecting the state's argument for absolute immunity under A.R.S. section 12–820.01.A without considering the validity of the immunity statute); *Galati v. Lake Havasu City,* 186 Ariz. 131, 920 P.2d 11 (App.1996) (discussing absolute immunity under section 12–820.01.A but no discussion regarding validity of statute); *Bird v. State,* 170 Ariz. 20, 821 P.2d 287 (App.1991) (discussing absolute and qualified immunity under A.R.S. sections 12–820.01 and 12–820.02).

retain Van Horn in custody fall directly within the language of A.R.S. section 12–820.02.-A.1. The statute explicitly confers qualified, not absolute, immunity for the failure to retain an arrested person in custody, and this specific statutory grant of partial immunity controls the degree of immunity afforded these defendants. While the dissent disagrees with the legislative decision that A.R.S. section 12–820.02 furthers a valid public policy, *infra* ¶ 42, our constitution instructs that, in this instance, the decision is for the legislature, not for the court.

¶ 27 The legislative enactment of a specific statutory provision that applies to the actions and entities involved here also serves to distinguish this situation from that which we considered in cases such as *Ruth v. Rhodes*, 66 Ariz. 129, 185 P.2d 304 (1947) and *Ryan*, 134 Ariz. 308, 656 P.2d 597. In those cases, we applied common law immunity principles in the absence of any statutory direction. After *Ryan*, however, the legislature provided the missing direction, as the constitution permits.

**D.**

¶ 28 Finally, we address briefly the concerns expressed by the dissent over the "unclear reach" of this opinion. *See infra* ¶ 71. The statutory scheme itself answers several of the dissent's concerns. For instance, the immunity statute we consider today applies only to public entities, which include the state and its political subdivisions, *see* A.R.S. § 12–820.6, so this opinion does not affect the status of municipalities. The immunity granted by statute extends to public employees acting within the scope of their employment, not to private activities of the employee, by the terms of A.R.S. section 12–820.02.A.[13] A public employee's failure to retain an arrested person in custody involves clearly governmental activity. Accordingly,

our holding today does not address the liability of the state for proprietary activity. Although future actions may involve these and other questions, they are not before us today. *See San Carlos Apache Tribe v. Superior Court,* 193 Ariz. 195, 203, 972 P.2d 179, 187 (1999) ("We ... confine ourselves to determining those issues properly raised by the parties and necessary to our determination of the validity of the challenged legislation."); *J.D.S. v. Franks,* 182 Ariz. 81, 95, 893 P.2d 732, 746 (1995) ("[W]e need not decide this issue to resolve this case, we will leave it to another day.").

**III.**

¶ 29 For the foregoing reasons, we conclude that the trial court correctly instructed the jury that it could return a verdict against the public defendants only if the plaintiffs established gross negligence. We therefore affirm the judgment of the trial court and vacate the opinion of the court of appeals.

CONCURRING: CHARLES E. JONES, Vice Chief Justice, and FREDERICK J. MARTONE, Justice.

FELDMAN, Justice, dissenting.

¶ 30 The court today holds that a right of action against the state is not protected by article XVIII, section 6 of the Arizona Constitution, which forbids legislative abrogation of the "right of action to recover damages for injuries." This is because the anti-abrogation clause is trumped by what the majority labels the "immunity clause" of article IV, part 2, section 18 (hereinafter article IV). I do not agree with the majority's abbreviated history, its conclusions, or its reasoning on this point and therefore dissent.

¶ 31 Even if I were to assume the majority's opinion is correct with respect to legis-

---

13. The dissent takes the majority to task for failing to separately discuss the immunity the statute affords to public employees, with particular reference to Deputy Dobbins, *infra* ¶¶ 52 to 65, and states the dissent would respond to the "majority analysis on this point if only it had presented one." *Infra* ¶ 55. What the dissent ignores is that no party either raised or argued this issue. The plaintiffs never asserted, in the trial court, in the court of appeals, or before this

court, that a different rule of immunity must apply to the deputy than to his employer. Moreover, the record makes clear that plaintiffs did not name the deputy in his individual capacity. This court traditionally does not address issues not presented by the parties, *see San Carlos Apache Tribe v. Superior Court,* 193 Ariz. 195, 203, 972 P.2d 179, 187 (1999), and the majority does not do so in this case.

lative power over claims against the state, the court goes much further than either the text of article IV or common law immunity allowed and excludes actions against state employees from the protection of the anti-abrogation clause. I also dissent from this because, with certain exceptions, the common law recognized and the anti-abrogation clause protected such actions. Nothing in the text of article IV mentions such actions, much less permits their abrogation.

## I. THE ACTION AGAINST THE STATE

### A. Sovereign immunity and article IV

¶ 32 Article IV requires the legislature to "direct by law in what manner and in what courts suits may be brought against the state." The majority today says these sparse directions empower the legislature to institute or re-institute the doctrine of sovereign immunity and thus forbid the bringing of any action against the state. The majority is reluctant to say that, but what else is meant when it concludes that the legislature has "power to control actions against the state" and authority "to define those instances in which public entities and employees are entitled to immunity"? *Ante* ¶¶ 24 and 25. But the language of article IV says no such thing. Whether actions may be brought is not addressed in the text; if anything, it seems to direct just the opposite. It seems to contemplate and assume such suits may be brought and empowers the legislature to regulate how and where they may be brought, not to forbid them. That interpretation not only follows the text but would harmonize article IV with the anti-abrogation provision of article XVIII, section 6.[14]

¶ 33 The majority, however, disregards the text of article IV and the framers' specific concern with damage actions and interprets article IV as an empowerment provision with respect to the doctrine of sovereign immunity, though nothing in the text of the constitution or the proceedings of the Constitutional

Convention supports this or indicates that the concept of sovereign immunity was mentioned, let alone discussed. Indeed, Arizona first recognized the doctrine of sovereign immunity—that "the king could do no wrong"—in 1920 in an action seeking to impose vicarious liability against the state for damages sustained when a derrick used in construction of the state capitol building fell on the plaintiff. *State v. Sharp,* 21 Ariz. 424, 189 P. 631 (1920). We held that it

> is well settled by the great weight of authority that the state, in consequence of its sovereignty, is immune from prosecution in the courts and from liability to respond in damages for negligence, except in those cases where it has expressly waived immunity or assumed liability by constitutional or legislative enactment.

*Id.* at 426, 189 P. at 631.

¶ 34 Absent from this holding is any indication that the court believed article IV left the question to the legislature. If so, of course, the legislature's failure to enact sovereign immunity would have meant that the doctrine was not recognized in Arizona because the only legislation implementing article IV had "authorized" suits against the state "on contract or for negligence." *See* Civil Code of 1913, section 1791. But the *Sharp* court itself imposed the immunity doctrine as a matter of common law. In fact, the court rejected the argument that the legislature waived or rejected immunity by enacting section 1791, Civil Code of 1913, which provided:

> All persons who have, or who shall hereafter have claims on contract *or for negligence* against the state, which have been disallowed, are hereby *authorized,* on the terms and conditions herein contained, *to bring suit thereon* against the state in any of the courts of this state of competent jurisdiction, and prosecute the same to final judgment.

The history of this provision and the framers' desire to deprive the legislature of power to forbid or interfere with damage actions is set forth in detail in *Kenyon v. Hammer,* 142 Ariz. 69, 688 P.2d 961 (1984), and need not be repeated here.

14. Article XVIII, section 6 reads as follows:

> The right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation.

Quoted in *Sharp*, 21 Ariz. at 426, 189 P. at 631 (emphasis added). If article IV conferred authority on the legislature with respect to enacting or rejecting sovereign immunity, then the statute was obviously a waiver or rejection. But we held that the effect of this statute was not to reject immunity but

> merely to give a remedy to enforce a liability, the state submitting itself to the jurisdiction of the court, subject to its right to impose any lawful defense. *Immunity from an action is one thing; immunity from liability is another; hence the state does not waive its immunity from liability* for the negligence of its agents, servants or employees....

*Id.* at 428, 189 P. at 632 (emphasis added).

¶ 35 No concern was shown about the legislature's authority under article IV. It was the court's authority under which sovereign immunity was imposed. Nor was the legislature later asked or permitted to play a part in abolishing the defense of immunity. What the court gave in *Sharp* it took away in *Stone v. Arizona Highway Commission*, holding that the "substantive *defense* of governmental immunity is now abolished." 93 Ariz. 384, 392, 381 P.2d 107, 112 (1963) (emphasis added). Again, the court seemed unaware of what the majority has today discovered in article IV-legislative authority to institute, abolish, or control the doctrine of sovereign immunity. The matter was simply one of common law.[15]

¶ 36 Thus, the principles developed in our construction of the anti-abrogation clause of article XVIII, section 6 apply. That clause protects not only the causes of action and theories that existed as of statehood in 1912 but also the rights protected by common law as it has evolved since statehood. *See Hazine v. Montgomery Elevator Co.*, 176 Ariz. 340, 343–44, 861 P.2d 625, 628–29 (1993).

Under the common law established in *Sharp*, the wrong was recognized and the right existed, but the state's liability could not be enforced because of the sovereign immunity defense. *Stone* upset that regime and abolished the defense. We said in *Hazine* that the law "must allow for evolution of common-law actions to reflect today's needs and knowledge. Any other rule would allow those 'long dead' to dictate solutions to problems of which they could not have been aware." *Id.* at 344, 861 P.2d at 629 (quoting *Boswell v. Phoenix Newspapers, Inc.*, 152 Ariz. 9, 18, 730 P.2d 186, 195 (1986)).

¶ 37 Therefore, when *Stone* abolished the sovereign immunity defense, the common law right to recover damages for the sovereign's torts came under the protection of article XVIII, section 6. The legislature should therefore not be permitted free reign over the doctrine, as today's majority holds.

### B. *Stone* and its progeny—legislative participation

¶ 38 The *Stone* court did not have kind words for the sovereign immunity doctrine. It described the doctrine as one that "rests upon a rotten foundation," and went on to say that it was "incredible" in modern times and "in a republic" to recognize this relic of "medieval absolutism" and to apply it to exempt government from liability for its torts and cast the entire burden of damage resulting from governmental wrongs on the individual victim rather than distributing it "among the entire community ... where it could be borne without hardship upon any individual, and where it justly belongs." 93 Ariz. at 388 n. 1, 381 P.2d at 109 n. 1 (quoting Annotation, *Rule of municipal immunity from liability for acts in performance of governmental functions as applicable in case*

---

**15.** Nor have we ever held that the *authority* to impose or abolish sovereign immunity resided in the legislature. The majority points out that we have said that "whether the doctrine ... should be modified ... is a legislative question." *Ante*, n. 9 (quoting *Lee v. Dunklee*, 84 Ariz. 260, 263–64, 326 P.2d 1117, 1119 (1958)). But what *Lee* meant was that although the created governmental immunity in *Sharp*, it believed, as a matter of deference, that any change should come from the

legislature rather than the court. That view, of course, prevailed for only five years, when the *Stone* court, upon "reconsideration," concluded that the "court-made rule" was "unjust or outmoded" and abolished it, at the same time mentioning and disapproving of its language in *Lee*. *Stone*, 93 Ariz. at 393, 381 P.2d at 113. *Stone*, in fact, overruled "all prior decisions," leaving the question to the legislature. *Id.* at 387, 381 P.2d at 109. This, of course, included *Lee*.

*of personal injury or death as result of a nuisance,* 75 A.L.R. 1196 (1931)).

¶ 39 Those words were perhaps too broad because immunities are quite often necessary to facilitate government operations. Thus, even when absolute sovereign immunity has been abolished, as in *Stone,* the state must be allowed leeway in the conduct of its governmental affairs, whether through the executive, legislative, or judicial branch. *Stone* recognized this, saying that "the rule is liability and immunity is the exception." *Id.* at 392, 381 P.2d at 112.

¶ 40 But when does the exception apply? We addressed this question in *Ryan v. State,* a case in which the state was sued for the Department of Corrections' negligence in allowing the escape of a youthful offender who later attacked and injured the plaintiff. 134 Ariz. 308, 656 P.2d 597 (1982). Reversing summary judgment for the state, we held that governmental immunity from liability for the torts of executive department officers and employees would not be recognized merely because the conduct in question involved discretion. *See id.* at 311, 656 P.2d at 600. We also abandoned the duty to all— duty to none concept. *See id.* at 310, 656 P.2d at 599. We went on to state:

> We are well aware that by removing the public/private duty doctrine, we have not solved all of the problems in this area. In electing to treat the state like a private litigant, we must hasten to point out that certain areas of *immunity must remain.* The more obvious of such immunities are legislative immunity, judicial immunity, and high-level executive immunity.

\* \* \*

> We deem an ad hoc approach to be most appropriate for the further development of the law in this field. We do not recoil from the thought that the legislature may in its wisdom wish to intervene in some aspects of this development.

*Id.* We did not advert to article IV, again having failed to recognize the legislative power today's majority reads into the constitution. Instead, we talked of judicially im-

posed limits to legislative power on that subject.

¶ 41 Having indicated that we could not draw bright lines to define the "limited parameters of immunity in the abstract," we undertook to define those lines and limitations on a case-by-case basis. *See id.* at 311, 656 P.2d at 600. We said that following the spirit of the *Stone* decision, *we propose to endorse* the use of governmental immunity as a defense only when its application is necessary to avoid a severe hampering of a governmental function or thwarting of established public policy. *Otherwise, the state and its agents will be subject to the same tort law as private citizens.*

*Id.* (emphasis added). *Ryan* thus did not leave governmental immunity and its boundaries to the legislature. Nor did the case preceding it, which recognized the historical basis of the quasi-judicial immunity afforded public officials such as members of the State Board of Pardons and Paroles. *See Grimm v. Arizona Board of Pardons & Paroles,* 115 Ariz. 260, 263 and n. 1, 564 P.2d 1227, 1230 and n. 1 (1977). Neither of these cases mentions legislative power under article IV. *Ryan* invited legislative participation in some aspects of defining immunity but made it quite clear that the court would impose limits. Those limits, of course, are grounded in article XVIII, section 6.

¶ 42 Thus, given the *Hazine* doctrine, the true question before us is whether A.R.S. § 12–820.02(A)(1), which provides a qualified immunity that limits liability to grossly negligent or intentional conduct, can be applied to the facts of this case. As the majority implicitly recognizes, conferring immunity except for gross negligence or intentional conduct is a type of abrogation of the cause of action for negligence, and the question is whether *Ryan* and article XVIII, section 6 permit this under the facts of this case. In my view, it is not permissible. The deputy's unauthorized release of this dangerous criminal by the side of the road was not the result of any governmental policy, essential or otherwise, but a violation of it. It was not the result of an executive decision at any level but a violation of every rule of law and common sense. Refusing to apply the stat-

ute under these facts would thwart no established public policy but, rather, would serve the policy of deterring government employees from careless (at best) dereliction of duty and would promote better training of police officers. In short, there is nothing but the overly-broad language of A.R.S. § 12–820.02(A)(1) to recommend immunity in this case, and as *Ryan* indicates, that alone is no longer enough to legitimize negligent conduct by state officers.

¶ 43 Because the anti-abrogation clause protects Plaintiffs' right of action, subject to the common law immunities described in *Grimm* and *Ryan*, we should resolve this case by determining whether the application of immunity fits with the boundaries set by *Ryan*, not by the majority's broad conclusion that redress for governmental wrongs is absolutely excluded from the protection of the anti-abrogation clause. I would therefore hold under article XVIII, section 6 as interpreted in *Hazine* and its predecessors that A.R.S. § 12–820.02(A)(1) cannot be constitutionally applied to this case. There are many situations in which the statute could be applied and would be beneficial. This case does not present such a situation, unless we are willing to say that a jailer who believes a dangerous criminal is unlawfully held may conduct his own habeas corpus review and issue an order for release, all without the assistance of a judicial officer. I therefore dissent from part II of the majority opinion.

### C. The effect of article IV, part 2, section 18

¶ 44 The state's principle argument was that article XVIII, section 6 did not apply to claims against the government because such rights of action did not exist at common law at the time of statehood. Evidently unable to muster three votes for that dubious theory, the majority instead grounds its opinion on article IV, holding that it provides independent and particularized grounds for the concept that the legislative branch is free to reinstate sovereign immunity in any form it should desire, notwithstanding the anti-abro-

gation provisions of article XVIII, section 6. I disagree with this conclusion.

¶ 45 The majority fails to consider that the "suits against the state" described in article IV include not just tort actions but also contract claims. See A.R.S. § 12–821.01 (Supp.1999), which presently implements article IV. Surely the framers did not intend to give the legislature power to abrogate every action against the state that escaped the protection of the contract clause of article II, section 25. According to the majority, the provisions of article IV trump those of article XVIII, section 6 because they are more specific. *Ante* ¶ 11. But they are not. Article XVIII, section 6, as the majority concedes, applies specifically to actions "to recover damages for injuries." *See ante* ¶ 11 (quoting article XVIII, section 6). There is simply no basis for holding that article IV is more specific than article XVIII, section 6. As noted *ante* ¶ 32, a more rational, textual interpretation of article IV is that the legislature was directed to provide for, not empowered to forbid, claims against the state.

¶ 46 The majority reasons that some states have interpreted their version of article IV to give the legislature the exclusive authority to waive sovereign immunity. *Ante* ¶ 16 and notes 6 and 7. The majority goes on to point out that in other states in which the courts, like those in Arizona, have abolished sovereign immunity, the legislature has reinstated the doctrine in one form or another and that these reincarnations have been upheld. *Ante* ¶ 18, citing cases in note 9. This is correct, but while these states, or at least many of them, have open court provisions similar to the open court provision in our article II, section 11,[16] none has a provision similar to the anti-abrogation rule of article XVIII, section 6. We have several times traced the history of article XVIII, section 6 and concluded that the clause is "more specific and stronger" than an open court provision. *See Boswell*, 152 Ariz. at 12 and n. 4, 730 P.2d at 189 and n. 4; *Kenyon v. Hammer*, 142 Ariz. 69, 74, 79–81 n. 9, 688 P.2d 961, 966, 971–73 n. 9 (1984); *Barrio v. San Manuel Div.*

16. "Justice in all cases shall be administered openly, and without unnecessary delay." Arizona Constitution article II, section 11.

*Hosp.*, 143 Ariz. 101, 105, 692 P.2d 280, 284 (1984) ("stronger and more explicit"). Thus, the constitutions of other states give their legislatures considerably greater authority than their courts in plotting the course of tort law. In Arizona, the court's primacy in the evolution of tort law has been established by *Kenyon* and cases such as *Hazine, Boswell,* and *Barrio.*

¶ 47 A recent Indiana case illustrates how Arizona's article XVIII, section 6 distinguishes our sovereign immunity law from that of other states with so-called open court provisions. Indiana's open court provision reads as follows: "All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law." Indiana Constitution article I, section 12. The Indiana Legislature adopted a statute providing that "any product liability action must be commenced . . . within ten (10) years after the delivery of the product to the initial user or consumer." Indiana Code section 33–1–1.5–5. After a consumer was injured by a defect some thirteen years after the product was delivered, the Indiana Supreme Court upheld the statute against a charge that it violated the open courts clause of article I, section 12. *See Dague v. Piper Aircraft Corp.,* 275 Ind. 520, 418 N.E.2d 207 (1981).

¶ 48 Then, in *McIntosh v. Melroe Co.,* the Indiana Supreme Court again upheld the constitutionality of the statute, this time on a challenge that it violated the "remedy by due course of law" clause of article I, section 12. 729 N.E.2d 972 (Ind.2000). Plaintiffs argued that there was a "protectable constitutional right to the remedy provided by the common law for product liability injuries," but the court rejected that argument, holding that Indiana's open court provision is not a guarantee against legislative abolition of common law remedies. *Id.* at 977–78. The Indiana Legislature "can make substantial changes to the existing law without infringing on citizen rights." *Id.* at 978. It also can abrogate the common law of products liability through a statute of repose because Indiana law has found no "fundamental right" to bring any particular cause of action to remedy any asserted wrong. *Id.*

¶ 49 This may be good law under the open court provisions in Indiana and other states, but it is not good law in Arizona. It is, in fact, directly contrary to the text and interpretation we have given to article XVIII, section 6. *See Hazine,* 176 Ariz. at 343–45, 861 P.2d at 628–30; *Boswell,* 152 Ariz. at 13–15, 730 P.2d at 190–92; *Kenyon,* 142 Ariz. at 82–83, 688 P.2d at 974–75. The legitimacy of the Arizona position has been established by the voters' rejection of several proposed initiative changes that would have abolished or severely modified article XVIII, section 6.

¶ 50 Thus, I am unable to agree with the majority that article IV authorizes the legislature to "define those instances in which public entities and employees are entitled to immunity." *Ante* ¶ 25. This does not mean, of course, that the legislature has no part in the evolution of the law on this point. We invited its participation in *Ryan,* and the only acknowledged limits we set to that participation are those contained in *Ryan:*

> [W]e propose to *endorse the use of governmental immunity* as a defense *only when its application is necessary* to avoid a severe hampering of a governmental function or thwarting of established public policy. *Otherwise, the state and its agents will be subject to the same tort law as private citizens.*

134 Ariz. at 311, 656 P.2d at 600 (emphasis added).

¶ 51 Legislative grants of immunity are therefore limited by *Hazine* and circumscribed by *Ryan.* The immunity granted by A.R.S. § 12–820.02(A)(1), as applied to these facts, nullifies *Ryan*'s holding and overrules it *sub silentio.* Thus, I dissent from the majority's reasoning as well as its conclusion.

## II. THE ACTION AGAINST THE EMPLOYEE

¶ 52 The deputy who released Van Horn was joined as a defendant and is an appellee in these proceedings. The majority holds that the constitution "confers upon the legislature" the power to give immunity to "public entities *and employees.*" *Ante* ¶ 25 (emphasis added). Presumably, this includes the deputy. Because the opinion contains no

separate discussion from whence the authority to confer immunity comes in the deputy's case, I must assume the majority concludes that because of article IV, the action against him is also outside the protection of the anti-abrogation clause. This holding, I believe, is contrary to the text of article IV and also is contrary to the common law as it existed before statehood and before and after *Sharp*.

## A. Employee immunity under article IV

¶ 53 The majority makes no separate explanation of its conclusion that despite article XVIII, section 6, the legislature is authorized to grant immunity for tort, qualified or absolute, to governmental employees such as Deputy Dobbins. It bases its conclusion with respect to the state on the provisions of article IV. But article IV, by its terms, applies only to the legislature's authority to "direct by law in what manner and in what courts suits may be brought *against the state.*" Article IV, part 2, section 18 (emphasis added).

¶ 54 Even if the majority is correct in holding that this gives the legislature authority to grant immunity in cases against the state, it requires a quantum leap of faith to apply this provision to a sheriff's custodial officer, the governor's chauffeur, and all other state employees. Dobbins is not the state. Why should a provision only applying specifically to suits against the state be applied to suits against individual tortfeasors employed by the state? The court does not explain. Nor, I think, can it explain.

¶ 55 And, if from some unknown source the legislature today and for the first time is given such power despite the anti-abrogation clause, why stop with state employees? Why not also immunize the state's agents and independent contractors? After all, do not history and common experience tell us that, just like the government, governmental employees, agents, and contractors can do no wrong?

¶ 56 I would be happy to argue against the majority analysis on this point if only it had presented one. There is no point, however, in tilting at windmills, so I can only say that I dissent from this unexplained and danger-ous *ipse dixit.* Article IV does not apply; the common law and article XVIII do.

## B. Liability of state employees under article XVIII, section 6

¶ 57 Indeed, our law on the immunity of governmental employees issue is so muddled as to illustrate the truth of *Stone's* dictum that the entire doctrine of sovereign immunity rests on a rotten foundation. *See ante* ¶ 38. The story starts with *Haupt v. Maricopa County,* 8 Ariz. 102, 68 P. 525 (1902). The Maricopa County Board of Supervisors sought to stop the spread of a diphtheria epidemic in Gila Bend by sending a doctor to handle the problem. The doctor proposed to do so by moving the infected Haupt family to a tent and then burning the family's home and all their possessions. The doctor won the family's consent by promising that the county would pay for the value of the destroyed home and goods. The doctor performed his part—he burned the house and possessions. Haupt filed a claim against the county for $988.08, but the supervisors voted to award only $400. He then sued the county, but not the doctor, in contract for the full amount. The trial judge gave the county a directed verdict, and Haupt appealed. This court—our predecessors—made the following comment:

> *A county* is the local subdivision of a state or territory. It is created by the state for the purposes of government. Its functions, political and administrative, have direct relation to the policy of the state. It is possessed of only such powers as the state chooses to give it. It *can incur no liability* except in pursuance of law. It cannot be made to respond for wrongs committed by its officers or agents unless the statute so declares.

*Id.* at 105, 68 P. at 526 (emphasis added). This comment about responding for wrongs was quite gratuitous in that Haupt had not brought a tort action or even one in eminent domain but only sought recovery in contract. The court actually noted that it did not have to deal with the question of the liability of counties for torts. *See id.* at 106, 68 P. at 526. Not surprisingly, the court had nothing to say about the liability of the county's

employee, Doctor Woodruff. After all, he had not been sued.[17]

¶ 58 Somehow these meager beginnings gave birth to our law on the tort immunity of governmental employees. We next addressed that issue in *Larsen v. County of Yuma*, 26 Ariz. 367, 225 P. 1115 (1924). Larsen's intestate drowned when his car ran off a bridge and fell into a canal. All this, it was alleged, was the result of the county engineer's negligence and the board of supervisors' failure to put and keep the road in a safe condition. Larsen sued in tort and joined the county, the supervisors, and the county engineer as defendants. The trial judge dismissed because the county could not be held liable for negligence and because the individual defendants, performing official duties and "exercising governmental functions" in "building and maintaining a public highway," also could not be held liable. *Id.* at 368, 225 P. at 1116. On appeal, we affirmed judgment for the county on the authority of *Sharp* and the "well-settled doctrine that the state may not be sued unless it consents." *Id.* at 369, 225 P. at 1116.

¶ 59 We also affirmed judgment for the individual defendants because "[a]s early as 1902, in *Haupt* ... the reason why neither a county nor its officers, *in performing governmental functions*, are liable in tort, was stated as follows...." The court then repeated *Haupt*'s dictum about the non-liability of counties. *See id.* at 369, 225 P. at 1116. The court acknowledged that *Haupt*'s statement of "the nonliability of the county and its officers for tort may be criticized as dictum" because Haupt sued on an "agreement of the county to pay." *Id.* at 370, 225 P. at 1116. But, the court said, "we think it has ever since been recognized by the bench and bar as the rule" in Arizona and "we would not like to announce the minority rule of liability." *Id.* Ignoring the dictum issue, the problem, of course, is that *Haupt* did not

contain a word about the tort liability of governmental employees because, unlike *Larsen* and the present case, none had been joined as a defendant.

¶ 60 It is easy to criticize the court's analysis in *Larsen*, but it has been on the books for seventy-five years and has been followed in a number of cases. It is hardly time to overrule what is left of it, especially when no one asks us to do so. But at the most, the *Larsen* court established tort immunity for governmental "officers" who committed the tort while "performing governmental functions." *Id.* at 369–70, 225 P. at 1116.

¶ 61 We next mentioned the matter of employee immunity in a case in which a school district and its trustees were sued for negligently setting fire to the plaintiff's house. *See School Dist. No. 48 of Maricopa County v. Rivera*, 30 Ariz. 1, 243 P. 609 (1926). While holding the school district, an arm of the state, was protected from liability by sovereign immunity, we said this about the liability of the individuals:

> [I]f the trustees of the school district committed a trespass, since the statute neither directly nor impliedly authorizes such action on their part, the act was an individual one, and the liability, if any, is theirs, and not that of the district.

*Id.* at 6, 243 P. at 610.

¶ 62 Some years later we reaffirmed *Larsen*, holding that a tort action for damages against the State Highway Commission and its members for negligent construction of a sewer line under a highway should be dismissed because the "commissioners [as officers of the state] individually only exercise governmental functions in the construction of highways." *Grande v. Casson*, 50 Ariz. 397, 410, 72 P.2d 676, 681 (1937).[18] There is a big difference between the deputy in this case who, without court order, released a danger-

17. Nor did the court mention or even note the question of why, if the sovereign were immune, that immunity did not extend to contract actions. Instead, the court acknowledged that the county could be held liable for breach of contract and reversed. *See id.* at 107, 68 P. at 527. If sovereign immunity is to be recognized, it presumably is the law that the government cannot be sued for anything without its consent, except when the constitution bestows the right of action, as in article II, section 17 of the Arizona Constitution (eminent domain).

18. Overruled in part by *State ex rel. Morrison v. Thelberg*, 87 Ariz. 318, 350 P.2d 988 (1960); overruled in part by *Stone v. Arizona Highway Comm'n*, 93 Ariz. 384, 381 P.2d 107 (1963).

ous criminal, and the state's officers who sat as members of the highway commission. There is also a big difference between the functions of the commissioners, whose duties include the exercise of governmental discretion in approving plans, construction contracts, and the like, and the functions of a sheriff's deputy, whose duties are confined to holding a prisoner in custody until a *judicial officer* orders the prisoner's release.

¶ 63 The Arizona history of this subject was next reviewed in a case in which tort damages were sought from a highway patrol officer who, while on duty, drove negligently and injured the plaintiff. *See Ruth v. Rhodes*, 66 Ariz. 129, 185 P.2d 304 (1947). The officer argued entitlement to summary judgment because "an officer of the State of Arizona is not liable in tort for negligence ... while in the performance of the governmental functions of the state." *Id.* at 132–33, 185 P.2d at 306. We disagreed, citing *Larsen* and *Grande* as having held *only that state and county public officers were immune* in "a very limited and specific factual situation, i.e., ... in regard to construction defects or failure of proper upkeep of bridges and highways." *Id.* at 133, 185 P.2d at 306–07 (emphasis added). We went on to state the "general rule applicable to the case at bar concerning the personal tort liability of state officers generally is quite uniformly to the contrary." *Id.*, 185 P.2d at 307. We then quoted with approval the following from "[a] leading case":

> We think that a sound public policy requires that public officers and employees shall be held accountable for their negligent acts in the performance of their official duties, to those who suffer injury by reason of their misconduct. Public office or employment should not be made a shield to protect careless public officials from the consequences of their misfeasances in the performance of their public duties.

*Id.* (quoting *Florio v. Schmolze*, 101 N.J.L. 535, 129 A. 470, 472 (1925)). *Florio* cited *Nowell v. Wright*, 85 Mass. 166, 1861 WL 4813 (1861), which in turn discussed prior cases for the proposition that paid public employees may be liable for damages caused by their negligence.

¶ 64 We followed that with an approving quote and illustration from RESTATEMENT OF TORTS § 888(c) (1939):

> (c) Public officers. While *there is no immunity by the mere fact that one is a public officer,* there are many situations where a person may be protected by the command of a superior or the existence of a privilege held by him because of his official position or because of a privilege held by another on whose account he acts.... Where, however, the other has not a privilege but has merely an immunity from civil liability, as is the case of a municipal corporation which is not liable for tortious conduct committed by its servants while in the performance of a governmental function, *the person who acts does not share the immunity.*

\* \* \*

> Illustrations: (3) A, the fire chief, drives a municipal car to a fire at an unnecessarily dangerous rate of speed, thereby causing a collision with and harming B. A is subject to liability to B, although the municipality by whom he is employed is not liable.

*Rhodes*, 66 Ariz. at 133–34, 185 P.2d at 307. We held the patrol officer was not entitled to common law immunity and affirmed the judgment against him.

¶ 65 The reader may well conclude from this examination of our cases that there is some confusion as to what was the common law with regard to immunity of government employees who commit a tort in the performance of their duties. But there is no confusion, I submit, as to what was *not* the common law. We have never held that the legislature could confer immunity from tort on all governmental employees, no matter the position they hold and the nature of the duties they perform. Quite the opposite. The state's highway commissioners may have had common law immunity in deciding whether to build a freeway or ordinary highway between Phoenix and Scottsdale, but I doubt it was or is the common law that even the governor has immunity if she runs a red

light while driving herself from one official meeting to another. Nor have we ever said anything that would indicate the governor's driver would have such immunity while driving the governor from meeting to meeting. Quite the opposite is true under pre-statehood common law principles.

## C. Pre-statehood common law principles

¶ 66 The common law would not have resolved the present case by conferring absolute immunity on the deputy but by looking at the type of office he held and the type of duty he was performing when he committed the tort.

¶ 67 We reviewed the status of the common law on the subject twenty years ago and concluded that the common law rule was liability and not immunity; immunity was a late judicial erosion of the common law principle that the state's officers were liable:

> It is generally agreed that the origin of official immunity (as well as of sovereign immunity) lies partly in the maxim "the King can do no wrong." Later the immunity of the sovereign from suit was modified by the Anglo American common law principle that no person is above the law; *the sovereign's officers were liable for their misconduct.* Such liability has gradually eroded in recent times until many courts formulate the rule that public officials are absolutely immune from suit at least for their discretionary acts. It is unclear why this change came about since it is a perversion of earlier reasoning.
>
> Over the years the potential liability of public officials as it related to what are termed "discretionary" functions became associated with—almost equated with—the traditional absolute immunity of judges. Until recently, however, this so-called quasi-judicial immunity was not a general immunity. The modern trend in the United States has been to grant more and more immunity to public officials. This development has occurred in the context of logical inconsistencies and often with only cursory reasoning.

*Grimm*, 115 Ariz. at 264, 564 P.2d at 1231 (citations omitted) (citing DICEY, THE LAW OF THE CONSTITUTION 189 (8th ed. 1915)).

¶ 68 This, of course, brings us full circle and back to *Ryan*, in which the plaintiff sought to impose liability not only on the state but also on the directors of the Arizona Department of Corrections and the Arizona Youth Center, both of which were held to be officers much different than the deputy here. By now, *Stone* had abolished the state's immunity. And in *Ryan*, in speaking of the immunity of the state, its officers, and employees, we cited *Rhodes* and noted that some immunity must remain for governmental officers, such as "legislative immunity, judicial immunity, and high-level executive immunity." *Ryan*, 134 Ariz. at 310, 656 P.2d at 599. The line, we said, must be set on a case-by-case basis on an *ad hoc* approach, and we "do not recoil" from the thought of legislative intervention in some aspects of this development. *Id.* No one could read this as the broad power today's majority gives the legislature to confer for the first time partial or absolute governmental immunity on all governmental employees, no matter the nature of their position and duties.

¶ 69 Indeed, we clearly said we would "endorse the use of governmental immunity as a defense only when ... necessary to avoid a severe hampering of a governmental function or thwarting of established public policy." *Id.* No governmental function is hampered and no public policy is thwarted by holding a deputy liable for releasing, without a court order, a dangerous criminal who had already attempted one murder. Quite the opposite—enforcing such liability might very well result in better training for law enforcement, more care in selecting qualified officers, and more careful thought by officers. Even if were we to adopt the majority's view on the state's immunity from vicarious liability, the majority's grant of immunity to the actual tortfeasor in the present case is not required by any holding this court has ever made, is contrary to the common law, and is thus an abrogation of the action for damages and forbidden by article XVIII, section 6.

¶ 70 As Justice Hays said in *Ryan*, "the underlying premise for the immunity is that it cannot be tortious conduct for a government to govern." *Id.* at 311, 656 P.2d at 600 (quoting *Commercial Carrier Corp. v. Indi-*

*an River County,* 371 So.2d 1010 (Fla.1979)). I joined in that opinion and still believe it to be correct. This case is not about governing. Applying *Ryan,* I therefore dissent from the majority's affirmance of the judgment in the deputy's favor.

### III. GOVERNMENTAL AND PROPRIETARY FUNCTIONS

¶ 71 The reach of the majority opinion is unclear. It evidently legitimizes legislative authorization of absolute or qualified governmental immunity for all "public entities and employees" engaged in governmental enterprises. *Ante* ¶ 25. But even after *Sharp* and before *Stone,* our jurisprudence rejected governmental immunity for proprietary municipal functions. Nor does it indicate whether judicial redress for municipal and proprietary torts is or is not protected by article XVIII, section 6.

¶ 72 But what is a "public entity"? The court tells us its opinion "does not affect the status of municipalities" but fails to define the status of municipalities and their employees. *Ante* ¶ 28. Here again, the law was confused and unclear and made little sense, mostly, as we said in *Stone,* because the whole doctrine of complete governmental tort immunity was illogical and nonsensical. *See ante* ¶ 38. Some things were nevertheless clear. First, the fact that proprietary governmental activities may not have been entitled to immunity was noted as early as *Sharp.* 21 Ariz. at 429–31, 189 P. at 632–33 (while construction of municipal auditorium was ministerial or proprietary and may not have been entitled to immunity, construction of state capitol was governmental and entitled to immunity).

¶ 73 There is no need to trace the complete evolution of the governmental-proprietary distinction in Arizona's common law of sovereign immunity. Suffice it to say that *no* case of ours ever recognized complete immunity for all governmental units no matter what the nature of the activity in which the government engaged. It was early recognized that municipal corporations were not entitled to immunity when engaged in proprietary functions. *Jones v. City of Phoenix,* 29 Ariz.

181, 183, 239 P. 1030, 1031 (1925). This, in fact, was described as the rule "of such almost universal acceptance ... that we accept it as the undoubted law of Arizona. The authorities are so united ... that no extensive citations are necessary." *Id.* (citing 28 C.J. 1527, 1528, and note). The rule was based on the quaint distinction that cities, unlike states, were unnecessary and formed only for the "advantage and convenience" of their residents. *Id.* (citing *Kaufman v. City of Tallahassee,* 84 Fla. 634, 94 So. 697 (1922)).

¶ 74 But, as the *Jones* court noted, there was "utmost confusion" about what was governmental and what proprietary. *Id.* Thus, collecting garbage is governmental and the city was immune, while providing water for all purposes (presumably to drink and to irrigate) so intermingled governmental and proprietary functions that the city could not claim its waterworks system was carried on as a governmental function. *See City of Prescott v. Sumid,* 30 Ariz. 347, 351, 247 P. 122, 124 (1926). This was not the only type of confusion, however; a county was generally thought to be merely a subdivision of the state, exercising only the powers delegated by the state, so that in general everything done by a county was governmental. *See Hartford Accident & Indem. Co. v. Wainscott,* 41 Ariz. 439, 444–45, 19 P.2d 328, 330 (1933) (purchase of liability insurance was *ultra vires* activity and supervisors required to reimburse county for premium payments made); *see also Larsen,* 26 Ariz. at 369, 225 P. at 1116. School districts, having been organized by the state for performance of the state's governmental obligation to educate its children, perform governmental functions only and are immune. *See School Dist. No. 48,* 30 Ariz. at 3–4, 243 P. at 609–10 (citing *Freel v. Crawfordsville,* 142 Ind. 27, 41 N.E. 312, 312 (1895)).

¶ 75 The operation of a county hospital was a governmental activity and thus immune, even though those able to pay were charged a fee. *See Lee v. Dunklee,* 84 Ariz. 260, 262, 326 P.2d 1117, 1118 (1958). It was not for the court to doubt the wisdom of such an application of the rule of sovereign immunity. *Id.* at 263–64, 326 P.2d at 1119. Four years

**492**

later, it was for the court to doubt the wisdom, and operation of a county hospital, which took paying patients as well as the indigent, was found to be partly proprietary in nature and therefore not immune to a suit by a paying patient. *See Hernandez v. Yuma County,* 91 Ariz. 35, 36–37, 369 P.2d 271, 272 (1962).

¶ 76 Salt River Project is actually two different entities, Salt River Project Agricultural Improvement and Power District and Salt River Valley Water Users' Association. The Association is a private corporation that delivers water to its customers. As such, it has no governmental immunity. On the other hand, the District, which provides electricity to its customers, is a political subdivision of the state, organized pursuant to article XIII, section 7 of the Arizona Constitution. Thus, it is "vested with the rights, privileges, and immunities granted ... political subdivisions of the state." *Local 266, Int'l Brotherhood of Elec. Workers v. Salt River Project Agric. Improvement & Power Dist.,* 78 Ariz. 30, 35, 275 P.2d 393, 396 (1954).

¶ 77 Maintenance of streets is a governmental function when performed by counties. *See Larsen,* 26 Ariz. at 368, 225 P. at 1116. But, surprisingly, street maintenance is a proprietary function when performed by municipalities, so the latter are not immune from vicarious liability for their employees' negligence. *Dillow v. City of Yuma,* 55 Ariz. 6, 8, 97 P.2d 535, 536 (1940) (citing four early cases, at least two of which did not even discuss the issue). Irrigation districts also perform proprietary functions, so immunity is inapplicable. *Taylor v. Roosevelt Irrigation Dist.,* 72 Ariz. 160, 164, 232 P.2d 107, 110 (1951).

¶ 78 I do not attempt to make sense out of these and the many other cases on our books and do not know if anyone can. Nor is the game worth the candle in light of the vast changes in the nature of governmental services. It is clear, I submit, that the common law immunity of the state's subgovernmental units was not recognized or established for all units or for all purposes. Cities, counties, and other subgovernmental entities could have been or were liable for a variety of activities, and rights of action arising from

such situations existed under *Hazine*'s interpretation of article XVIII, section 6 and were protected from abrogation. Thus, insofar as the majority opinion could be read to the contrary, I dissent. I also dissent from the failure to ask, address, and answer these questions. This is not an ordinary case. The legislature needs to know what lies within its power and what does not. So do the various subdivisions and agencies of government and, more important, the people of this state. All need to know what comes next in addition to confusion and vast amounts of litigation.

## CONCLUSION

¶ 79 What may come next is of serious concern. Human nature, particularly that of the bureaucracy, is such that it is unlikely any public entity will approach the legislature with a request that it be held responsible, as are common folk, for its misdeeds or those of its employees. What I fear we will hear, instead, is the need for immunity of all kinds because otherwise the agency is underfunded, unable to meet its obligations, its employees are concerned about liability and therefore unable to perform their duties, its budget will not allow for the cost of risk management or paying the bills for its misdeeds, the judicial system is unworkable, juries cannot be trusted, and so on, *ad infinitum.* Notwithstanding the aims of our founders, and despite a long line of Arizona cases on the anti-abrogation clause, the legislature will now be empowered to do anything it wants with regard to the grant of absolute or partial immunity to public entities (whatever that means), to public employees of those entities (whatever that includes), and to heaven knows who and what else. All this, we are told, is to be left to decision of future cases. There will indeed be a lot of future cases.

CONCURRING: THOMAS A. ZLAKET, Chief Justice.